

# SUPREME COURT OF MISSOURI
## en banc

In re: Eric Alexander Farris,      )
                                      )
                 Respondent.    )    No. SC94418
                                      )
                                      )

### ORIGINAL DISCIPLINARY PROCEEDING

*Opinion issued September 8, 2015*

The Office of Chief Disciplinary Counsel ("OCDC") filed an Information in two counts charging Respondent Eric Farris ("Farris") with various violations of the Rules of Professional Responsibility (the "Rules").[1] The Advisory Committee of the Supreme Court of Missouri appointed a disciplinary hearing panel (the "DHP") to hear the case. Following a hearing, the DHP found that Farris committed numerous instances of misconduct under the Rules, including misappropriation of client funds, and recommended that Farris be suspended indefinitely with no leave to apply for reinstatement for six months.

Both Farris and the OCDC disagree with the DHP's decision. Farris maintains that he committed no wrongdoing but, if he is to be disciplined, argues that he should be given a stayed suspension and a term of probation. Conversely, the OCDC agrees with

---

[1] Unless otherwise noted, the Rules cited to in this opinion are those in effect between January 2010 and June 30, 2013. Rule 4-1.15 was restructured effective July 1, 2013. For ease of reference, cross-references have been added in the margin to indicate where the relevant provisions may now be found.

the DHP's findings but argues that the proposed discipline is insufficient and that Farris should be disbarred.

After a *de novo* review of the record, the Court finds that Farris committed the violations alleged in the Information and orders that he be disbarred.

## I.      The Charges

The two counts in the Information focus on Farris' representation of clients in two cases. The facts relating to these representations are summarized below.

### A.      Count I – Client A[2]

In June 2005, Client A hired Farris to represent her in a personal injury action. The case was settled for $197,500, and the check was deposited into Farris' trust account in September 2010. Under a written contingent fee agreement, Farris was entitled to 40 percent of Client A's recovery. Client A was entitled to the remainder (i.e., $118,500), less expenses.

Prior to the settlement, the hospital that treated Client A's injuries filed a notice of lien in the amount of $114,604.31. Client A also owed other medical providers in relation to her injuries. As a result, Farris told Client A he would keep her share of the settlement in his trust account and use it to pay the hospital and her other medical creditors. However, Farris told Client A he would negotiate with these creditors to see if they would accept less than the full amount of their bills. If so, Farris told Client A he would distribute the savings to her.

---

[2]  To protect the clients involved in this case, this opinion will only refer to them as Client A and Client B.

Beginning in November 2010, Client A called Farris many times in an effort to find out when she would receive her share of the settlement. Finally, in January 2011, Farris sent Client A a $50,000 check from his trust account. This check stated that it was for "Client's Partial Recovery." Farris did not tell Client A whether he had paid any of her medical bills and did not tell her what negotiations he had had with those providers. Over the next nine months, Client A tried frequently to contact Farris about the balance of her settlement. Her requests were ignored or prompted only vague replies.

On October 21, 2011, Farris sent Client A a second check from his trust account. This check was in the amount of $31,756.11. Farris provided no explanation for the amount of the check and no information concerning the status of his negotiations with the hospital or the other medical creditors. When Client A tried to deposit this check, however, it was returned due to insufficient funds. Client A immediately sought an explanation from Farris. After several calls and one cancelled meeting, Client A succeeded in meeting with Farris and his then-wife on November 15, 2011, to discuss why this check bounced.

At the November 15 meeting, Farris provided Client A with a summary of how her settlement proceeds had been distributed. This summary shows the total amount of the settlement ($197,500), the amount of Farris' fee ($79,000), the expenses paid from Client A's share ($2,139.58), and the amount of Client A's initial disbursement ($50,000). The remainder of Client A's share, therefore, was $66,360.42.

The summary Farris gave to Client A also showed that the total amount of her "Medical Bills" was $66,360.42. Farris told Client A that, because all of the remaining

3

funds from the settlement had been paid to Skaggs Hospital "in full satisfaction and accord" of her bill, there was nothing left to distribute to her. Client A asked Farris to confirm that the hospital had been paid in full. Farris reassured her and told her there was nothing to worry about.[3]

Farris did not explain – in November 2011 or at any time since – why he decided to send Client A this trust account check for $31,756.11. He was supposed to be holding the remainder of Client A's settlement to satisfy the claim of the hospital and Client A's other medical creditors. If the hospital and the remainder of Client A's providers had agreed to settle all of her bills for a total of $34,604.31, Farris would have been justified – in fact, bound – to send Client A a check for the $31,756.11 balance of her settlement. Farris knew that this explanation would be untrue, however, and never offered any other.

Instead of explaining why he sent Client A a second trust account check for such an odd amount, Farris focused solely on trying to explain why that check bounced. Farris stressed – to Client A and, later, to the OCDC – that he had fulfilled his obligation to Client A by sending the remaining settlement funds (i.e., $66,360.42) to Skaggs Hospital in "full satisfaction and accord" of Client A's bill. Farris insists that the only reason his (unexplained) trust account check to Client A was returned for insufficient funds is that

---

[3] Farris also told Client A it was his "policy" not to take a fee that exceeds his client's net recovery. Accordingly, Farris said he would reduce his fee from $79,000 to $64,000, and give this $15,000 to Client A to increase her net recovery to $65,000. Farris explained that he could not pay Client A this $15,000 immediately, however, because both his trust account and his office account were "low." As a result, Farris said he would have to pay Client A the $15,000 in installments. He executed a promissory note and, over the next several months, made good on that promise.

4

he sent it to Client A before learning that his wife had sent the $66,360.42 check to the hospital.

The DHP characterized this "explanation" as "bordering on the disingenuous." DHP Decision at p. 15. That characterization is generous because Farris' explanation is illogical, inconsistent and demonstrably false. Despite Farris' claims, the timing of the two checks was not the cause of the problem. If Farris knew he had gotten the hospital to agree to accept $66,360.42 as full payment of Client A's debt, then he also knew there was nothing left of the settlement proceeds to send to Client A – and certainly not enough to cover the check for $31,756.11 he sent her.

But this is not what happened, and Farris knew it. He knew that the hospital never agreed with him to accept this sum in satisfaction of Client A's debt because he knew he had never had any discussions (let alone agreements) with the hospital on that subject or any other. Accordingly, Farris knew he had no justification for sending Client A any more of the settlement proceeds and no basis for telling Client A that he had "taken care" of her hospital bill.

Not only was Farris' explanation to Client A and to the OCDC illogical and inconsistent, the evidence also showed that it was false. In an effort to bolster his explanation that the trust fund check to Client A bounced solely because the entire balance of the settlement had been paid to Skaggs Hospital, Farris produced to the OCDC a photocopy of that $66,360.42 check. Upon investigation, however, the OCDC learned that the hospital never received this check and, therefore, never presented it for payment.

5

Because Farris never sent the $66,360.42 check to the hospital and the hospital never presented it for payment, that check played no role in causing Client A's check to bounce. Instead, the evidence showed that the check bounced because – by November 2011 – all of the money Farris was supposed to be holding in his trust account for Client A and her medical creditors was gone. It had been transferred to Farris' office account and spent for his benefit.

Farris lied to cover up this misappropriation. When Client A asked Farris at the November 15, 2011, meeting to confirm that her hospital bill had been paid in full, he lied and told her she did not need to worry about it. In truth, Farris never paid any of this debt. So, at the moment Farris assured her that she no longer needed to worry about her hospital bill, Client A still owed the hospital more than $106,000. By then, however, there was no money left from her settlement to help pay it.

To summarize, after deducting his reduced fee ($64,000), expenses ($2,139.58), and payments to Client A ($65,000),[4] Farris held $66,360.42 in his trust account for the benefit of Client A and her medical creditors. They never received any of this money. Instead, all (or nearly all) of this $66,360.42 was transferred to Farris' office account, where it was used to pay his personal and business expenses.[5] The available evidence

---

[4]  Because of the hospital's lien, an argument can be made that Farris also misappropriated the $50,000 he initially sent to Client A. The Court makes no findings in this regard, however, as it was not part of the charge in the Information.

[5]  The OCDC's audit showed that, by November 11, 2011, the trust account had a balance of $3,053.63. This is far less than the $93,000 or more that should have been there to cover Farris' obligations to Client A, Client B, and their medical creditors. The audit also showed that this money had all been transferred to Farris' operating account (or, in one instance, to one of Farris' personal accounts). By November 11, 2011, however, this money had been spent and the

6

shows that Farris knew all of this by November 2011. To date, he has not paid or promised to pay any of this money to its rightful owners.

### B. Count II – Client B[6]

When Farris' trust account check to Client A bounced in October 2011, the bank automatically notified the OCDC under Rule 4-1.15(g)[7] and related regulations adopted by the Advisory Committee. The OCDC conducted an audit and learned that Farris not only had misappropriated funds from Client A's settlement, but he also had misappropriated settlement proceeds belonging to Client B under nearly identical circumstances.

In September 2010, Client B settled their personal injury claims for $90,500, which was deposited in Farris' trust account. After deducting Farris' fee ($30,000) and expenses ($773.70), Client B was entitled to the remaining $59,726.30. Like Client A, however, Client B owed various medical creditors in connection with their injuries. The total of their combined bills was $27,132.20. No liens were filed, but the terms of Client B's settlement required that their medical providers be paid from the settlement proceeds. Farris agreed to indemnify the defendant's insurer if this was not done.

---

OCDC's audit showed that Farris' operating account held only $2,221.32. That Farris knew the $93,000 was gone from both accounts is confirmed by his statement to Client A on November 15, 2011, that both his trust account and his operating account were too "low" for him to pay the $15,000 fee refund immediately.

[6] Client B was a married couple, both of whom were injured.

[7] After the amendment in 2012, this provision is now found in Rule 4-1.15(a)(2).

Farris wrote Client B a check from his trust account for $32,594.10 and told Client B he would use the remaining settlement funds (i.e., $27,132.20) to satisfy their medical providers. As he did with Client A, Farris promised Client B he would try to negotiate discounts with these providers. To the extent he succeeded, Farris told Client B he would distribute the savings to them.

Farris never paid any of Client B's medical bills, nor did he pay these funds to Client B. Instead, nearly all of the $27,132.20 that he was supposed to be holding in trust for Client B was transferred to Farris' office account and spent. The available evidence shows that Farris knew of this since November 2011. To date, he has not paid or promised to pay any of this money to its rightful owners.

## II.    *The DHP Findings and Conclusions*

The DHP found that Farris committed the Rule violations alleged in the Information. The specific violations and pertinent portions of the DHP's decision are set forth below:

(1)    Farris violated Rule 4-1.4 by failing promptly to comply with Client A's reasonable requests for information. The DHP found:

> Respondent failed to comply with [Client A's] reasonable requests for information. [Client A] testified that she contacted Respondent many times requesting status reports. Respondent failed to comply with these requests.
>
> After Respondent issued a trust account check to [Client A] for $31,756.11, and the check was returned marked "insufficient funds," [Client A] tried to contact Respondent several times unsuccessfully before Respondent would meet with her. The Panel believes the Respondent knew or should have known that he was dealing with the client improperly by failing to adequately communicate with her. The failure to communicate resulted in a two year delay from the time [Client A] should have received information

and was instead receiving excuses from Respondent. In that time there was not sufficient money in Respondent's trust account to pay the obligations on behalf of [Client A].

DHP Decision at pp. 9-10 (citations omitted).

(2)     Farris violated Rule 4-1.15(i)[8] by failing promptly to deliver to Client A (or her medical creditors) and to Client B (or their medical creditors) the settlement funds to which they were entitled. Regarding Client A, the DHP found:

As to Count I, Respondent failed to promptly deliver to [Client A] or third person medical providers funds that she or third person medical providers were entitled to receive. Respondent told [Client A] he would take care of the medical bills but did not pay them. By the date of the hearing, Respondent still could not account for the money that was otherwise due to [Client A] or her third party medical providers.

… The Panel believes that Respondent knowingly failed to maintain funds in his trust account to pay medical bills of [Client A]. He knowingly failed to negotiate with the health care providers. The money he kept in his trust account to pay the health care providers of [Client A] disappeared. It was not paid to [Client A] or to her health care providers.

DHP Decision at p. 10. Regarding Client B, the DHP found:

Particular note must be made about Respondent's own Exhibit D, page 24, which was [Client B's] "Personal Injury Settlement Distribution Worksheet." It notes in the bottom starred paragraph that Respondent was withholding $11,847.41[9] in his trust account in order to negotiate and pay outstanding medical bills, and after doing so, "a Final Distribution Worksheet authorizing payment of said negotiated amount and the savings from said negotiation will be paid over to" [Client B]. Such was not done as promised by Respondent. Nonetheless he closed his file and destroyed

---

[8]   After the amendment in 2012, this provision is now found in Rule 4-1.15(d).

[9]   This reference is to only one spouse's medical creditors. Farris also withheld more than $15,000 for the other spouse's medical creditors. *See* Respondent's Exh. D, page 25. Together, Farris agreed to hold in trust $27,132 of Client B's settlement for their medical creditors, with the understanding that Client B would receive any remainder.

9

file documents. No excuse or explanation was offered for this failure to complete the job the clients hired him to do.

DHP Decision at p. 11.

(3)     Farris violated Rule 4-8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation in his representation of Client A and Client B. The DHP found:

> As to Count I, Respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation by continuing to produce a series of various excuses, rather than valid explanations for his failure to account for the missing funds. He also produced a check to Skaggs Hospital on his trust account and claimed that he attempted to pay [Client A's] hospital lien. In fact the check was never delivered to Skaggs or presented for payment.
>
> … As to Count II, the Panel believes that Respondent's conduct regarding [Client B] was dishonest or fraudulent. It does not appear that he attempted to negotiate with the medical providers. The money owed to them, or to [Client B], disappeared from the trust account.

DHP Decision at p. 12

(4)     Farris violated Rule 4-8.1(c) by failing to comply with OCDC's requests for complete copies of Farris' expense receipts and communications with Client A's medical creditors. The DHP found:

> The disciplinary authority requested that Respondent provide a complete copy of his expenses, receipts and communications with Skaggs Hospital regarding the [Client A] matter. Similar requests were made regarding the [Client B] matter. Respondent failed to comply with the requests and never provided the information sought …. Respondent has a duty to respond to the disciplinary authority promptly and completely. Respondent failed in that duty. He was asked to provide documentation from his file to the disciplinary authority and failed to do so. Respondent was asked to provide documentation regarding his communication with [Client A's] and [Client B's] medical providers and failed to do so.

DHP Decision at pp. 12-13.

10

(5)     Farris violated Rule 4-1.15(m)[10] by failing to maintain the files from Client A's

and Client B's representations for the required length of time.  The DHP found:

> The disciplinary authority requested information from the [Client A] file
> and the [Client B] file.  Respondent stated he was unable to comply because
> he could not locate the file.  Respondent failed to maintain the files and
> supporting documents as required.  At the hearing, Respondent was not
> able to explain why the files could not be located.  Respondent pledged to
> retrieve the documents and supplement his response, but failed to do so.

DHP Decision at p. 13 (citations omitted).

(6)     Farris violated Rule 4-1.15(c)[11] and (i) by misappropriating client funds, by

repeatedly transferring those funds from the trust account to his operating account,

and by using those funds for personal/non-business expenditures.  The DHP

found:

> Respondent misappropriated funds of clients. Respondent repeatedly
> transferred funds from the trust account to his operating account,
> where those funds were used for personal/non-business
> expenditures.  He also transferred funds to at least one other account
> he owned, without any designation or record attributing the transfer
> to any particular client file or billing, and improperly paid credit card
> "merchant service fees" from the trust account without proper
> reimbursement.  (T. 122. 123: 31-32: Ex 18).

> … Years have passed and the remainder of [Client A's] and [Client
> B's] settlement is unaccounted for.  The money has not been paid to
> the clients or to their medical providers and is not in the trust
> account.

DHP Decision at p. 14.

---

[10]   After the 2012 amendment, this provision is now in Rule 4-1.22(a).

[11]   After the 2012 amendment, this provision is now in Rule 4-1.15(a).

After considering aggravating and mitigating factors, the DHP recommended that Farris' license be suspended indefinitely with no leave to apply for reinstatement for six months. Pursuant to Rule 5.19(d), both the OCDC and Farris rejected the DHP's decision and recommendation. As a result, the matter is to be decided in this Court on the record made before the disciplinary hearing panel. Rule 5.19(d)(3).

## III. Findings and Conclusions of this Court

The DHP's findings of fact and conclusions of law are advisory. *In re Belz*, 258 S.W.3d 38, 41 (Mo. banc 2008). This Court decides the facts *de novo*, "independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law." *In re Snyder*, 35 S.W.3d 380, 382 (Mo. banc 2000). Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed. *In re Crews*, 159 S.W.3d 355, 358 (Mo. banc 2005).

### A. Farris Committed the Charged Misconduct

After reviewing the record before the DHP and the briefs and arguments of counsel in this Court, the Court finds the facts as set forth above. A clear preponderance of the evidence shows that Farris promised to hold $66,360.42 from Client A's settlement in trust for her and her medical creditors. He committed to pay Client A's medical creditors and to distribute any savings he might generate by negotiating reductions with those creditors to Client A. Instead, Farris never paid any of Client A's providers, never negotiated discounts with any of them, and then lied to Client A by telling her that her hospital bill had been paid. Instead, the money Farris was to hold in trust was transferred to Farris' office account and spent for Farris' business and personal purposes.

12

The evidence also shows that Farris promised to hold $27,132.20 in trust for Client B and their medical creditors, to pay those creditors, and to distribute any savings he might generate from negotiating discounts with those providers to Client B. Farris failed to perform any of these promises. As with Client A, Farris never paid any part of any of Client B's medical bills and never distributed the remaining settlement funds to Client B. Instead, the $27,132.20 he was supposed to be holding in trust for Client B and their medical creditors was transferred to Farris' office account and spent for his benefit.

As a result, Farris knowingly violated Rule 4-1.15(c) by failing to maintain more than $93,000 in his trust account as he promised for the benefit of Client A, Client B, and their medical creditors. He knowingly failed to distribute this property promptly to the rightful owners in violation of Rule 4-1.15(i). Farris knowingly commingled this property with the funds in his operating account and knowingly converted these funds when the balance of his operating account fell below the amount he was to have held in trust. This conduct constituted misconduct under Rule 4-8.4 because it involved dishonesty, fraud, deceit and misrepresentation. *See In re Ehler*, 319 S.W.3d 442, 450-51 (Mo. banc 2010) ("Converting client funds necessarily involves deceit and misrepresentation. Therefore, [respondent] has violated Rule 4–8.4(c)."); *In re Phillips*, 767 S.W.2d 16, 18 (Mo. banc 1989) (respondent engaged "in illegal and dishonest conduct when he received funds on behalf of [the client] and converted these funds to his own use by placing them in his office account without the consent of [the client]").

Farris contends he "did not know" about the improper transfers and expenditures because they were made by his then-wife, though with Farris' authority and for his

13

benefit. The Court rejects this contention. By November 2011, the evidence shows that Farris knew nearly all of the $93,000 had been transferred to (and spent from) his operating account. Even if Farris ignored these facts, as he contends, he concedes that such knowledge became inescapable no later than November 2012, when the OCDC completed its investigation and confronted Farris with the facts. Accordingly, Farris has knowingly misappropriated these funds then and thereafter.

For more than 30 months, therefore, Farris knowingly has failed to make good on his Rule 4-1.15 obligations to Client A and Client B (and their medical creditors). Even though restitution is no defense to charges of misappropriation, *In re Mentrup*, 665 S.W.2d 324, 325 (Mo. banc 1984), Farris' dogged refusal to even attempt to make restitution in the face of indisputable evidence that he has misappropriated (and spent) $93,000 he was supposed to hold in trust for his clients and their creditors demonstrates that he acted knowingly. *See In re Robison*, 519 S.W.2d 1, 3 (Mo. banc 1975) ("transgression committed by respondent is a serious one and … respondent has made no effort to restore the funds"); *In re Griffey*, 873 S.W.2d 600, 603 (Mo. banc 1994) (lawyer's "subsequent attempt to cover up the improper conduct [misappropriation] compounds the seriousness of the deeds and belies his argument of mistake").

In addition to the foregoing violations, the Court finds that Farris failed to provide a prompt and accurate accounting when Client A asked about her settlement. This is a violation of Rule 4-1.15(i). Instead, he lied to Client A by telling her that he had paid the hospital $66,360.42 and lied to her by telling her that this payment fully settled her debt to that provider. This conduct violated Rule 4-8.4. Because Client B relied on Farris'

14

promises, they never asked whether he had fulfilled these promises, and Farris never told them that he had not done so. Nevertheless, Farris' failure to make any attempt to follow through on his commitments to Client B shows that his initial promises to them, coupled with his subsequent misappropriation of their settlement proceeds, also violated Rule 4-8.4.

Finally, when asked by the OCDC to provide records concerning Client A's and Client B's settlements, Farris provided tardy and incomplete responses and lied to OCDC as well. In an effort to corroborate the story he told Client A, Farris produced a photocopy of the hospital check that he claimed caused Client A's check to bounce. He failed to disclose to the OCDC that the check had never been sent to the hospital, however, and that it was never presented for payment (or paid) from the trust account. Farris failed to produce the trust account records required by Rule 4-1.15(d),[12] and he claimed to be unable to locate the clients' files even though he was required to retain those files for at least ten years following the conclusion of the representation. This conduct violated Rules 4-8.1, 4-8.4, and 4-1.15(d) and 4-1.15(m).

### B. Farris Cannot Avoid Responsibility by Blaming his Ex-Wife

Farris does not deny that he was obligated to hold $93,000 in trust for these clients and their medical creditors. Nor does he deny that this money was transferred in his name to his office operating account, where it was spent for his benefit. Nevertheless,

---

[12] After the 2012 amendment, this provision is now in Rule 4-1.15(f).

Farris insists that he committed no misconduct and violated no Rules because all of this was his ex-wife's fault.

Farris claims that his then-wife "took over and controlled the administrative, financial and accounting matters of the office." Resp. Br. at 8. He testified to the DHP that he "shouldn't have trusted a spouse who turned out to be a thief," that he made a "mistake of trusting a thieving spouse," and that this is merely a "case of an attorney who was taken advantage of by his thieving spouse that caused this problem." The evidence tells a different story.

The evidence shows it was Farris, not his wife, who told Client A and Client B that he would hold some of their settlement proceeds in trust and use it to pay their medical providers. The evidence shows it was Farris, not his wife, who told these clients he would try to negotiate discounts and distribute any resulting savings to his clients. The Court finds that Farris knew he had undertaken these obligations and knew he failed to honor them.

The evidence also shows that Farris knew Client A was seeking information from him, not his wife, and he knew his responses were neither timely nor truthful. Farris knew the obligation to respond promptly and truthfully to the OCDC belonged to him, not his wife, and Farris knew he failed to fulfill that obligation as well. Finally, Farris knew that he – not his wife – had a duty under the Rules to maintain each client's file for the requisite period and a duty to maintain "complete records" of his trust account showing the date, amount, source and explanation for each deposit or withdrawal. Farris knew he failed to do so.

16

Farris authorized his then-wife to make transfers from his trust account to his office operating account but now claims that he did not know what transfers she made or whether they were proper. Farris authorized his then-wife to pay his personal and professional expenses from his operating account but now claims that he did not know she was spending commingled client funds when she did so. The Court finds that Farris was not ignorant of these transactions or the fact that they were improper.[13]

The evidence shows that the $93,000 that Farris was supposed to be holding in trust for Client A and Client B (or their medical providers) was siphoned out of Farris' trust account and deposit into Farris' office account, where it was spent for his benefit. This conversion was not the result of one or two accidental transfers, quickly reversed. It was the result of a continuous and systematic effort to drain money out of Farris' trust account and convert it to his personal use. The DHP accurately summarized: "After many transfers for large, exactly even dollar amounts, Respondent began transfers of odd dollar amounts from his trust account, many for $9,999 without offering rational explanation." DHP Decision at p. 15 (noting that transfers of less than $10,000 did not trigger the bank's automatic federal reporting obligations).

---

[13] Even if the Court believed that Farris did not know of the misappropriation of the $93,000 belonging to his clients and their medical creditors when each transfer occurred, the fragile bubble of Farris' innocence burst long ago. By November 2011, a preponderance of the available evidence shows Farris knew all of this money was gone – not just from his trust account, but from his operating account as well. Farris admitted as much to Client A on November 15, 2011, when he noted that both his operating account and trust account were too "low" to permit him to pay the $15,000 he promised. The $66,360.42 check to Skaggs Hospital did not explain the absence of Client B's money, and a single glance at his bank statements would have shown Farris that this check did not explain the absence of Client A's funds either.

Farris claims his then-wife – not he – made each of these transfers, and he did not know they were improper. Farris cannot avoid responsibility so easily. Instead, as explained above, the Court finds that Farris knew all of the salient facts by November 2011. He knew that he had no right to the trust funds, that they had been transferred and commingled with his office operating account, and that his personal and business expenditures had drained this account so close to zero that nearly all of the $93,000 had been spent and converted to his personal use. *See In re Schaeffer*, 824 S.W.2d 1, 5 (Mo. banc 1992) ("When an attorney deposits the client's funds into an account used by the attorney for his own purposes, any disbursement from the account for purposes other than those of the client's interests has all the characteristics of misappropriation, particularly when the disbursement reduces the balance of the account to an amount less than the amount of the funds being held by the attorney for the client."); *In re Fenlon*, 775 S.W.2d 134, 142 (Mo. banc 1989) . Accordingly, the Court agrees with the finding of the DHP on this issue: "***Respondent*** misappropriated funds of clients. ***Respondent*** repeatedly transferred funds from the trust account to his operating account, where those funds were used for personal/non-business expenditures." DHP Decision at p.14 (emphasis added).

Not only is Farris' argument refuted by the facts, it also is immaterial. Farris is not insulated from discipline so long as he authorizes someone else to make the improper transfers and expenditures instead of doing them himself. Nor is Farris insulated as long as he stays ignorant of the improper nature of each transfer or expenditure at the precise moment it occurs. Under Rule 4-1.15, Farris is accountable for the misappropriation of client funds whether he physically makes the transfers and expenditures himself or his

18

wife makes them with his authorization and for his benefit. The duty to safeguard and properly distribute trust account funds is non-delegable. If an attorney relies on a non-lawyer in fulfilling this duty, the attorney bears the risk of the other's non-performance. *Matter of Williams*, 711 S.W.2d 518, 520 (Mo. banc 1986). Accordingly, regardless of whether Farris' ex-wife misused the authority Farris had given her, Farris alone is responsible for fulfilling the obligations and responsibilities imposed upon him by the Rules.

### C. Farris Cannot Avoid Responsibility by Failing to Keep Records

Even though Farris' attempt to blame his ex-wife fails because the evidence shows he knew he had misappropriated his clients' money, his defense raises a more significant issue. Rule 4-1.15(d)[14] requires each attorney to keep detailed records showing, among many other things, the source of every deposit to – and the purpose of every disbursement from – that attorney's trust account. These records must also show, for each separate client or trust beneficiary, the source of all funds deposited, the identity of the client or third person for whom the attorney is holding those funds, and the date, payee and purpose of each disbursement of those funds.

No attorney who has complied with Rule 4-1.15(d) can claim, as Farris does, that he "did not know" someone he had authorized to make transfers from his trust account was doing so improperly. Such a claim would be refuted both by the existence of the Rule 4-1.15(d) records and the fact that the attorney kept them. Thus, one of the twin

---

[14]   This provision is now found at Rule 4-1.15(f).

19

purposes of Rule 4-1.15(d) is to ensure that an attorney always knows what money is being moved into or out of the trust account and why. The other purpose of Rule 4-1.15(d) is to ensure that, if a problem arises with an attorney's trust account, the OCDC and this Court are not forced to depend on the attorney's self-serving memory and claims that he "did not know."

The Court abandons the purposes of Rule 4-1.15(d) if it allows a lawyer's failure to maintain the required records to work to that attorney's benefit. To avoid this result, the failure to comply with Rule 4-1.15(d) must give rise to an inference of knowledge, particularly when the attorney tries to defend a charge of misappropriating trust account funds on grounds that the required documents plainly would support or refute had the attorney kept them. Other courts routinely draw such an inference.

> Because of the specific, strict, and affirmative record-keeping obligations placed on attorneys in the maintenance and operation of their escrow accounts containing the trust funds of clients and third parties, the failure to maintain those records to document an attorney's claim of how and when those funds were received and expended, as well as an attorney's claimed authorization to make disbursements, may be disbelieved and an adverse inference drawn where such required corroboration is not forthcoming.

*Attorney Grievance Comm'n of Maryland v. Nwadike*, 6 A.3d 287, 297 (Md. 2010).

Accordingly, the Court holds that Farris is charged with knowledge of what the records required by Rule 4-1.15(d) would have showed had he kept them. As a result, Farris is deemed to have known, no later than November 2011, that the $93,000 he was supposed to be holding in trust for Client A, Client B, and their medical creditors had been transferred improperly from his trust account, commingled with his operating account, and converted to his personal use by spending the balance of the operating

20

account below the level necessary to make good on the misappropriated trust funds.  In this case, these facts are established by a preponderance of the evidence, but they also are to be inferred simply from the fact that Farris knowingly failed to keep the records required by Rule 4-1.15(d).

The Court holds that Farris knew or should have known his then-wife was systematically looting the trust account by transferring funds to Farris' operating account (where he and she spent it to pay Farris' personal and business expenses) and, even if he did not, this knowledge must be inferred from Farris' failure to keep the records required by Rule 4-1.15(d).  Finally, the Court holds that Farris' obligation to safeguard others' property and distribute such property to its rightful owners promptly under Rule 4-1.15 is non-delegable and his reliance on his ex-wife to fulfill these obligations does not relieve him of the responsibility and accountability when (as he claims) she failed to do so.

### D.  Disbarment is the Appropriate Discipline

The DHP recommended that Farris be suspended with no leave to apply for reinstatement for six months.  The panel's recommendation is advisory, however, and may be rejected by this Court.  *In re Coleman,* 295 S.W.3d 857, 863 (Mo. banc 2009).  "The privilege to practice law is only accorded those who demonstrate the requisite mental attainment and moral character."  *In re Haggerty,* 661 S.W.2d 8, 10 (Mo. banc 1983).  The principal aim in disciplinary proceedings is not punishment.  *In re Staab*, 719 S.W.2d 780, 784 (Mo. banc 1986).  Instead, discipline is intended to protect the public and preserve the integrity of the legal profession.  *In re Maier,* 664 S.W.2d 1, 2 (Mo. banc 1984).  "The discipline must be designed to correct any antisocial tendency on the

21

part of the attorney as well as to deter others who might tend to engage in similar violations." *In re Staab*, 785 S.W.2d 551, 554-55 (Mo. banc 1990) (citing *In re Montrey,* 511 S.W.2d 805, 806 (Mo. banc 1974)).

In this case, even though Farris committed an array of serious violations, the most serious is his misappropriation of nearly $93,000 that belonged to his clients and their medical creditors. Historically, this Court has refused to tolerate the misappropriation of a client's money.

> The misappropriation of a client's funds is a serious matter. It is always a ground for the disbarment of an attorney that he has misappropriated the funds of his client, either by failing to pay over money collected by him for his client or by appropriating to his own use funds entrusted to his care. That respondent has made restitution of the converted funds is no defense to these charges.

*In re Mentrup*, 665 S.W.2d at 325 (citations omitted). To be clear, disbarment is not automatic. *See In re Belz*, 258 S.W.3d at 43 ("Disbarment is most often appropriate in misappropriation cases, but this Court will nonetheless consider the presence of aggravating and mitigating factors in each case when assessing the appropriate punishment."). However, disbarment constitutes the "baseline sanction" for misappropriation. *Id.* at 42. *See also Matter of Mendell*, 693 S.W.2d 76, 78 (Mo. banc 1985) ("We follow our recent cases holding that an appropriate remedy for willful conversion or misappropriation of client's funds is disbarment."); *In re Fenlon*, 775 S.W.2d at 142 ("It is always grounds for disbarment when an attorney has misappropriated the funds of his client, either by failing to pay over money collected by him for his client or by appropriating to his own use funds entrusted to his care.");

*In re Oliver*, 285 S.W.2d 648, 655 (Mo. banc 1956) ("'Misconduct of attorneys in converting and using money held in a fiduciary capacity has been before us in other cases. We have uniformly held such conduct justifies disbarment.'") (quoting *In re Conner*, 207 S.W.2d 492, 499 (Mo. banc 1948)).

Nothing has changed to warrant a retreat from the firm stance taken in these cases. Attorneys today must hold just as much (or more) money in trust for their clients and others as in the past. This Court's rules requiring attorneys to safeguard such property are as stringent now as ever before. And, most importantly, this Court's obligation to protect the public and the profession from attorneys who violate this trust is as important today as ever. There simply is no room in this profession for attorneys who take property held in trust for others and use it as their own.

One new feature on the disciplinary landscape since *Mentrup* is the Court's reliance on the 1986 American Bar Association's Standards for Imposing Lawyer Sanctions, as amended in February 1992 (the "ABA Standards").[15] With no change to the substantive provisions of Rule 4, or to the procedural provisions of Rule 5, the Court began relying on the ABA Standards in 1994. *See In re Coe*, 903 S.W.2d 916, 922 (Mo. banc 1995) (Covington, J., dissenting) (collecting cases). But the ABA Standards are merely guidance, and they do not supplant this Court's prior decisions. *See In re Ehler*, 319 S.W.3d at 451 ("This Court looks to the ABA Standards for Imposing Lawyer

---

[15]  These standards are now published in the ABA 2013 Edition of the "Compendium of Professional Responsibility: Rules and Standards," pp. 437 - 469.

23

Sanctions for guidance when imposing attorney discipline but considers the ABA Standards advisory.").

Here, a proper application of the ABA Standards confirms that this Court's cases are correct and disabarment is the presumptively appropriate discipline for misappropriating client funds.  *See* ABA Standards § 4.11 ("Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.").  *See also In re Belz*, 258 S.W.3d at 42 (noting that, in the absence of mitigating or aggravating circumstances, Standard §4.11 provides that disbarment is the "baseline sanction" for failing to preserve client property).  Because Farris knowingly misappropriated nearly $93,000 belonging to his clients or their medical creditors, the Court holds that the presumptive discipline for Farris' misconduct is disbarment.

### 1. *Mitigating Circumstances*

Though disbarment is the presumptive discipline, the Court must consider mitigating and aggravating circumstances before determining whether to depart from this discipline in a particular case. *In re Belz,* 258 S.W.3d at 42.  Mitigating factors do not constitute a defense to a finding of misconduct.  *Id*.  But they may justify a downward departure from the presumptively proper discipline. *In re Ehler*, 319 S.W.3d at 452.  By the same token, an aggravating factor need not constitute a separate instance of misconduct.  Instead, aggravating circumstances may justify a level of discipline greater than the presumed discipline or confirm that the presumed discipline is appropriate for the particular case.

24

Here, again, Farris contends that the conduct of his ex-wife is a mitigating circumstance that should compel the Court to stay any suspension and, instead, place him on probation. The Court disagrees. For the reasons stated above, Farris' efforts to blame his wife did not provide the defense he claimed. For the same reasons, Farris' efforts to blame his wife do not constitute a mitigating circumstance. By November 2011, there were enough warning signs for Farris to know that something was seriously wrong with his trust account.

Farris knew he was supposed to be holding more than $93,000 for the benefit of his clients and their medical creditors. Then, in October 2011, the $31,756.11 trust account check Farris sent Client A was returned for insufficient funds. A mere glimpse at his bank records would have shown that this was not the result of a payment to Skaggs Hospital (or to any of Client A's or Client B's other medical providers). Instead, Farris would have seen that nearly all $93,000 had been bled into his operating account (usually in transfers of $9,999 or equally suspicious amounts). By November 11, 2011, the balance of Farris' trust account was down to $3,056.63. Finally, as if to dispel any contention that Farris was guilty only of commingling, not misappropriation, the balance of Farris' operating account on that same November 11 bottomed out at only $2,221.32. *See In re Schaeffer*, 824 S.W.2d at 5 ("on nineteen separate occasions between deposit of the check into the business account and payment to the client of the $3,000 owed to her, the balance in the business account dropped below $3,000"); *In re Fenlon*, 775 S.W.2d at 142 ("For substantial periods of time … the balance in the office account was insufficient to cover the amount owed."). By November 2011, therefore, Farris knew his clients'

settlement funds had been misappropriated and were gone. Farris insists he remained ignorant of these facts until November 2012 but concedes that the OCDC's investigation showed him what he claims he previously missed.

The Court holds above that the duty to comply with Rules rests with Farris, not his wife. In *Matter of Williams*, 711 S.W.2d at 520, the lawyer claimed that his wife's mishandling of the trust account was to blame for his misconduct. Unlike the present case, the Court noted in *Williams*: "Although respondent recognizes his ultimate responsibility for the acts of his employee-wife regarding the trust account and therefore does not offer them in defense to the charges, he does offer his ignorance in mitigation." *Id.* The Court rejected this mitigation argument, however, because the lawyer failed to review his trust account records in the months leading up to the overdraft. *Id.* at 521. In the wake of the overdraft, the Court found "he knowingly and intentionally failed to correct the ongoing problems or supervise the account … and that he should have reviewed the account and taken corrective action to ensure [the client] would receive the funds belonging to him." *Id.* The Court held:

> We cannot allow an attorney to escape ultimate responsibility for mishandling of a client's funds where he knowingly and intentionally ignores trust account problems and demonstrates an almost total disregard for the protection of those funds. Certainly where an attorney misappropriates a client's funds, protection of the public is uppermost in our minds and disbarment is generally appropriate in such cases. Given the nature of the violation, and respondent's long disregard for the protection of his clients' funds, respondent's testimony regarding recent improvements upon his accounting system does not offer sufficient safeguard to the public interest and therefore cannot alter the result here.

*Id.* at 522.

Like in *Williams*, the Court holds that Farris' efforts to blame his ex-wife do not constitute a mitigating circumstance. A lawyer cannot escape responsibility for misappropriation by blaming someone acting within the lawyer's authority and for the lawyer's benefit. The duty to safeguard and promptly deliver property held in trust for a client or third party belongs only to the lawyer, and the lawyer remains accountable for compliance with that duty. *In re Griffey*, 873 S.W.2d at 603 (office disarray, lack of organization, construction, and the loss of a secretary "are insufficient to mitigate the seriousness" of the lawyer's misconduct).

The Court also rejects Farris' argument that his ill health is a mitigating factor weighing against disbarment. According to Farris, he suffered a pulmonary embolism in November 2010, which caused him to miss "at least two weeks" of work, and another embolism in 2013. These episodes came well before and well after the conduct at issue in this case. Farris does not explain what effect these events had on his actions or why they should be considered mitigating factors. Instead, Farris seems to argue that they contributed to his reliance upon his then-wife and her supposed misuse of the authority Farris gave her. Because his wife's conduct is not a mitigating circumstance, Farris' health – and any impact it may have had on his wife's conduct – also is not a mitigating circumstance.

Finally, Farris argues that evidence from satisfied clients should be considered in mitigation of the presumptive discipline for his misconduct. As the DHP noted, however, none of these clients "had been in similar situations where Respondent held large sums of settlement monies on their behalf in his trust account." DHP Decision at p. 15. In fact,

27

Client B presumably would have been equally satisfied with Farris' representation until they were told (as a result of the OCDC's investigation into Client A's complaint) that Farris had misappropriated $27,132.20 that should have been paid to them or their medical providers.

Accordingly, the Court finds no mitigating circumstances sufficiently compelling to overcome the presumptive discipline of disbarment in this case.

### 2. *Aggravating Circumstances*

Because of the absence of mitigating circumstances, the presumptive disciple applies and the Court does not need to consider aggravating circumstances. In this case, however, there is a wealth of aggravating circumstances that reinforce the Court's conclusion that disbarment is the proper discipline in this case.

A list of common aggravators is provided in ABA Standards § 9.22. This list is set forth below, and each factor is followed by a summary of the evidence establishing it in this case:

(a) prior disciplinary offenses;

> Farris was found to have violated Rules 1.4, 1.16(d) and 8.4(d) in 1998.

(b) dishonest or selfish motive;

> The Court finds, as did the DHP, that Farris' "dishonest or selfish motive … is demonstrated by Respondent siphoning trust account funds into his office account and paying personal, non-office related bills and expenses." DHP Decision at p.14.

(c) a pattern of misconduct;

> The Court finds that the two counts in this case show a pattern of Farris: (1) telling clients that he was withholding a portion of their

28

settlement to pay their medical providers; (2) failing to negotiate discounts with these creditors or to his clients' debts to them; and then (3) siphoning the money that should have gone either to the clients or their creditors to his operating account and spending it on his business and personal expenses.

(d)  multiple offenses;

Even though this opinion focuses principally on Farris' two violations of Rule 4-1.15(d), the Court also finds that he violated: Rule 4-8.4(c) (two counts of misconduct "involving dishonesty, fraud, deceit and misrepresentation"); Rule 4-1.4 (failure to respond promptly to Client A's reasonable requests for information); Rule 4-8.1 (two counts of failing to respond to lawful demands for information from the OCDC); Rule 4-1.15(m) (two counts of failing to securely store clients' files for ten years after completion of the representation; and Rule 4-8.4(d) (two counts of conduct prejudicial to the administration of justice).

(e)  bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

The Court finds, as did the DHP, that Farris engaged in "bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency…." DHP Decision at p.13.

(f)  submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

The Court finds, as did the DHP, that Farris "submitted false statements and false evidence to try to cover up the abuse of the trust account when he produced a check to Skaggs Hospital that was never tendered."  DHP Decision at p. 14.  The Court agrees that Farris' testimony in this case was "generally questionable and often bordering on the disingenuous."  *Id.* at 15.

(g)  refusal to acknowledge wrongful nature of conduct;

The Court finds, as did the DHP, that Farris showed "a lack of remorse or acceptance of what should be obvious [his] responsibility …. Respondent does not seem to express any sincere acknowledgement of the least wrongdoing or need for any

corrections in his practice, nor offered any evidence of the same other than laying blame on others." DHP Decision at p. 15.

***

(i) substantial experience in the practice of law;

Farris has been practicing law for 20 years.

(j) indifference to making restitution;

The Court finds, as did the DHP, that Farris' "conduct with respect to restitution has been one of indifference, as set out in Standards Section 9.22(j). Years have passed and the remainder of [Client A's] and [Client B's] settlement is unaccounted for. The money has not been paid to the clients or to their medical providers and is not in the trust account." DHP Decision at p. 14. "Despite verbal apologies, Respondent has made no firm offer of full restitution to either [Client A] or [Client B]." *Id.* at 15.

(k) illegal conduct, including that involving the use of controlled substances.

The Court expresses no opinion as to whether Farris' conduct was illegal because Farris concedes that the misappropriation of nearly $93,000 from his trust account was illegal. He merely contends that it was his ex-wife, not he, who committed these illegal acts. The week before the DHP hearing, Farris filed a criminal complaint against his ex-wife arising out of these circumstances. For disciplinary purposes, however, the only relevance of Farris' allegations regarding his ex-wife's actions is that Farris is responsible – and accountable – for those actions under Rule 4-1.15(a)(3).[16]

The aggravating circumstances confirm that the there is no reason to depart from

the presumptive discipline of disbarment in this case.

---

[16]  Even though Farris is responsible for the actions of his wife for purposes of the Rules of Professional Conduct, the Court expresses no view concerning whether his wife also may be liable for that conduct under the criminal laws of this state. The two matters are unrelated and are neither mutually exclusive nor necessarily conjunctive.

*Conclusion*

When a lawyer misappropriates property belonging to a client or a third party, that lawyer breaches one of the fundamental duties of this profession. Doing so not only injures the property owner, but also the Bar as a whole. *See In re Belz*, 258 S.W.3d at 46-47 ("misappropriation of client funds presents a paramount risk to the integrity of the legal profession. Our profession relies intrinsically on the trust that clients are willing to place in their lawyers, and few acts of misconduct have the capacity to erode that trust more quickly and thoroughly than the conversion of a client's funds to one's own use."). The New Jersey Supreme Court eloquently explained why this breach, perhaps more than any other, sullies the reputation of the entire legal profession and not merely the errant practitioner.

> Like many rules governing the behavior of lawyers, this one has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.
>
> It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.
>
> Abuse of this trust has always been recognized as particularly reprehensible: "(T)here are few more egregious acts of professional

> misconduct of which an attorney can be guilty than misappropriation of a client's funds held in trust." (*In re Beckman*, 79 N.J. 402, 404-05, 400 A.2d 792, 793 (1979)).

*Matter of Wilson*, 409 A.2d 1153, 1154-55 (N.J. 1979).

In *Belz*, *Mentrup* and *Mendell*, among others, this Court held that misappropriation of client funds is a grave matter and "most often" warrants disbarment. Unlike New Jersey, this Court admits the possibility that "in a rare but appropriate case a sanction other than disbarment may be appropriate for intentional misappropriation where mental illness is shown to have played a role in the misconduct and other substantial mitigating factors are also present." *In re Belz*, 258 S.W.3d at 46.[17] But no such factors are at work here.

There is no doubt that Farris misappropriated $93,000 belonging to Client A, Client B, and their medical creditors. Farris claims that he did not know of this misconduct because he relied entirely on his then-wife to comply with Rule 4-1.15. The evidence does not support this claim. Even if it did, however, such reliance is not a defense to a charge of misconduct, and it is not a mitigating circumstance that would justify a downward departure from the presumptive discipline of disbarment.

The Rules permit a lawyer to delegate authority with respect to a trust account to some degree, but the lawyer always remains responsible – and accountable – for compliance with the Rules. Blind and unquestioning reliance in the face of clear warning

---

[17] The "other substantial mitigating factors" present in *Belz* were: (a) the attorney repaid all of the misappropriated funds, with interest; (b) the attorney self-reported the misconduct to the OCDC; and (c) the attorney fully disclosed the misconduct to all affected clients. *In re Belz*, 258 S.W.3d at 40.

signs that the lawyer's obligations under Rule 4-1.15 are not being met will not protect the lawyer from charges of misconduct for violating that Rule, and it will not serve to mitigate the presumptive discipline for such a violation.

Lawyers are not permitted the defense of ignorance concerning their treatment of others' property. By requiring lawyers to keep complete trust account records, Rule 4-1.15(d) imposes an affirmative duty to inquire and understand the information in those records. A failure to do so does not protect the lawyer; it creates an inference that the lawyer knew all that those records would have shown.

Here, by November 2011, Farris knew that $93,000 of his clients' money had been transferred to his office account and spent for his personal and business purposes. Even if Farris did not know this, compliance with Rule 4-1.15(d) would have shown him so. A mere glance at his bank records would have dispelled the mist of ignorance in which he now claims to have been operating. Accordingly, Farris knowingly misappropriated these funds regardless of whether he personally made each improper transfer and expenditure or his then-wife made them with his authority and for his benefit. Because there are no compelling mitigating circumstances in this case, and because of the extensive aggravating circumstances, the only proper discipline for Farris' misconduct is disbarment.

_____
Paul C. Wilson, Judge

Breckenridge, C.J., Fischer and Russell, JJ., concur;
Draper, J., dissents in separate opinion filed;
Stith and Teitelman, JJ., concur in opinion of Draper, J.



# SUPREME COURT OF MISSOURI
## en banc

IN RE: ERIC ALEXANDER FARRIS, )
                                         )       No. SC94418
                                         )
            Respondent.           )

## DISSENTING OPINION

Missouri courts have heretofore adhered to a system of progressive discipline. *In re Forck*, 418 S.W.3d 437, 444 (Mo. banc 2014). This system was not established to punish attorneys for their actions, but rather, is designed to protect the public and maintain the integrity of the legal profession. *In re Stewart*, 342 S.W.3d 307, 308 (Mo. banc 2011). The principal opinion abandons these principles in that it seeks to punish Eric Alexander Farris (hereinafter, "Farris"). It further abandons this Court's duty to protect the public in that by disbarring Farris, the Court loses all authority and influence over him to seek restitution for the clients affected in this case. Accordingly, and as set forth in this separate opinion, I would accept the Disciplinary Hearing Panel's (hereinafter, "DHP") findings of misconduct, but I would impose a greater discipline than the DHP recommended. I believe Farris should be suspended indefinitely from the practice of law with no leave to reapply for two years. Further, I would order that Farris must make complete restitution to the two clients harmed by his actions before he may apply for reinstatement.

**Farris' Conduct**

Based on the record made by the DHP and before this Court, Farris committed multiple violations of the rules of professional conduct. The principal opinion's tone paints Farris in a more negative light than the DHP did. For example, the principal opinion consistently refers to times in which it believes Farris lied. Yet, following its hearing, the DHP found that it was "not impressed with the explanations offered by [Farris], and finds his testimony generally questionable and often bordering on disingenuous." Consistent with the DHP's findings, I would find Farris committed the following violations in relation to two clients, Client A (hereinafter, "Client A") and Client B (hereinafter, "Client B"):

*Violation of Rule 4-1.4*

Rule 4-1.4 requires a lawyer to keep a client reasonably informed about the status of a matter and to comply promptly with reasonable requests for information. Client A made multiple telephone calls and requests for information from Farris. Farris failed to return her telephone calls promptly and did not comply with her requests for information.

*Violation of Rule 4-8.4*

Rule 4-8.4(c) specifies that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. Farris provided excuses at the hearing as to his accounting for Client A's missing funds; he was never able to explain to whom or why the funds were actually distributed. Farris presented a check made payable to Skaggs Hospital, but that check was never delivered nor presented for payment. Additionally, there appears there was no attempt to negotiate with Client

2

B's medical providers. Any funds owed to those medical providers or to Client B disappeared from the trust account without an accounting.

*Violation of Rule 4-8.1*

Rule 4-8.1(c) provides that in connection with a disciplinary matter, a lawyer shall not "knowingly fail to respond to a lawful demand for information from [a] disciplinary authority …." Here, the OCDC requested a complete copy of Farris' expense receipts and communication with Skaggs and Client B's medical providers. Farris was also asked to provide documentation from his files. Farris violated this rule by failing to comply with these requests.

*Violations of Rule 4-1.15*

Farris committed multiple violations of Rule 4-1.15. Rule 4-1.15 requires that a lawyer must safely keep the property of the client. Here, Farris misappropriated client funds from Client A and Client B. There were multiple transfers of funds from Farris' trust account to his operating account, from which those funds were used for personal or non-business matters. Farris also transferred funds from the trust account to another account he owned without any designation attributing the transfer to any particular client, file or billing. Farris improperly paid credit card "merchant service fees" from the trust account without proper reimbursement.

Rule 4-1.15(d) provides that a lawyer is required to maintain and preserve complete client records of the client trust account for five years after the termination of the representation or the date of the last disbursement of funds, whichever event is later. Farris failed to maintain complete records of the funds that Client A and Client B were

3

entitled to receive. Farris was unable to provide an explanation for the withdrawals from his trust account as required by this rule.

Rule 4-1.15(i) provides that once receiving funds in which a client or a third person has an interest, a lawyer shall promptly deliver the funds to the party who is entitled to receive them and render a full accounting. Farris failed to deliver funds to either Client A, Client B, or Skaggs. Farris could not account for the money that was due to Client A, Client B, or Skaggs.

Further, had there not been an investigation into Client A's representation, the missing funds from Client B's settlement would not have been discovered. Farris should have retained a portion of Client B's settlement proceeds to negotiate and pay the outstanding medical bills and then pay Client B any remainder. However, Farris failed to do so.

Rule 4-1.15(m) provides that a lawyer shall securely store a client's file for ten years after completion of representation. Farris was unable to locate these files, and he was unable to explain why the files could not be located.

*Appropriate Discipline*

Misappropriation of client funds is one of the most serious types of attorney misconduct. *In re Belz*, 258 S.W.3d 38, 42 (Mo. banc 2008). While disbarment is most often the appropriate discipline, there is no automatic disbarment rule. *Id.* "To disbar an attorney, it must be clear that the attorney is not fit to continue in the profession; disbarment is reserved only for clear cases of severe misconduct." *In re Mirabile*, 975 S.W.2d 936, 939 (Mo. banc 1998). "This Court relies on the ABA Standards when

4

imposing sanctions to achieve the goals of attorney discipline." *In re Coleman*, 295

S.W.3d 857, 869 (Mo. banc 2009).[1]

It is this Court's duty to determine what discipline is appropriate to impose for

these violations by reviewing similar past cases, the disciplinary rules, and the applicable

ABA standards. *In re Stewart*, 342 S.W.3d 307, 310 (Mo. banc 2011). This Court notes

that generally when considering what sanction to impose, this Court considers four

factors:

> (a) the duty violated;
> (b) the lawyer's mental state;
> (c) the potential or actual injury caused by the lawyer's misconduct; and
> (d) the existence of aggravating or mitigating factors.

*ABA Standard* 3.0 (2013 Ed.) When this Court finds an attorney has committed

multiple acts of misconduct, "the ultimate sanction imposed should at least be consistent

with the sanction for the most serious instance of misconduct among the violations."

*Coleman*, 295 S.W.3d at 870 (internal citations omitted). Farris' most egregious act of

misconduct is his mishandling of client funds in his trust account.

Turning to the *ABA Standards*, this Court first examines the recommended range

of discipline for a failure to preserve client property. "Disbarment is generally

appropriate when a lawyer knowingly converts client property and causes injury or

potential injury to a client." *ABA Standard* 4.11. "Suspension is generally appropriate

when a lawyer knows or should know that he is dealing improperly with client property

and causes injury or potential injury to a client." *ABA Standard* 4.12. "Knowledge" is

---

[1] This Court recognizes that the ABA Standards are used for guidance in imposing attorney discipline, and the most recent ABA Standards were published in 2013. *See In re Ehler*, 319 S.W.3d 442, 451 (Mo. banc 2010).

defined as "the conscious awareness of the nature of attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *ABA, 2013 Ed., Compendium of Professional Responsibility: Rules and Standards* at 452.

Farris' misconduct did not arise out of an intentional choice to violate the rules of professional conduct and to take advantage of his clients. The record reflects that Farris attempted to retain some of his clients' settlement proceeds and stated he would attempt to negotiate down medical bills his clients owed in hopes of providing them a greater monetary recovery. However, at the same time, Farris was plagued with his own personal health issues and negligently entrusted some of the running of his legal office to his former wife, with whom he had built a family and maintained a trusted relationship. Farris demonstrated a concern to help his clients reduce their medical bills and, thereby, increase their settlement recovery.

Once misconduct is established, this Court may consider aggravating and mitigating circumstances when deciding what sanction to impose. *ABA Standard* 9.1. I believe the record contains evidence of both circumstances.

With respect to aggravating circumstances, Farris committed multiple rule violations in connection with his representation of both Client A and Client B. Farris does not acknowledge fully the misconduct he has committed; rather, he assigns all of the blame to his former wife. Farris is an experienced attorney with substantial experience in the practice of law. *ABA Standard* 9.22(a), (c), (d), (g), and (i).

However, I disagree with the principal opinion's characterization of Farris' prior admonishment from 1998 as disciplinary history and an additional aggravating factor. An admonishment may be issued by the OCDC or the regional disciplinary committee upon a finding of probable cause without any action by this Court and without an actual hearing on or finding of misconduct. *See* Rules 5.11 and 5.16. Accordingly, Farris' admonishment should not be considered an aggravating factor.

With respect to mitigating circumstances, at the time of these charges, Farris suffered from serious health issues and the deterioration of his marriage. Farris represented to this Court his concern for his clients and his desire to return all funds to them. Farris reported his former wife's conduct, and she is being prosecuted criminally. Farris has been an active member of the Bar and his community; many people think well of him. *ABA Standard* 9.32(c), (d), (g), (l), and (m).

The principal opinion believes that this Court should not consider the actions of Farris' former wife in determining his appropriate punishment, that "if an attorney relies on a non-lawyer in fulfilling this duty, the attorney bears the risk of the other's non-performance." Principal Op. 19 (citing *Matter of Williams*, 711 S.W.2d 518, 520 (Mo. banc 1986)). However, in *Williams*, this Court also found that an attorney's reliance upon his wife may be considered a mitigating circumstance in certain instances. *Id.* at 520.

Farris knew or should have known by mid-November 2011 that something was wrong with the bookkeeping in his accounts, but there was no evidence presented that he knew his former wife was making transactions to the detriment of his clients. Farris did

7

not supervise his former wife properly; Farris was negligent in his supervision. Farris'

actions did not rise to the level of culpability of the attorney in *Williams* who knowingly

allowed his wife to continue maintaining his trust account. *See id.* at 520-21. Farris

should have known that relying on his former wife's statements regarding the status of

client funds or of the trust account was inappropriate. Further, Farris and his former wife

dissolved their marriage acrimoniously, and Farris instigated a criminal investigation

against his former wife. While Farris did not intend to violate the rules of professional

conduct, he should have known of the improper transfers from his trust account and the

mishandling of client funds. *See ABA Standard* 4.12. Disbarment is not appropriate in

this case because there is not a preponderance of evidence in the record demonstrating

Farris knowingly converted his clients' property. *See ABA Standard* 4.11.

## Conclusion

There must be significant discipline to maintain the public's trust and protect the

integrity of the legal system; accordingly, Farris' request for probation is not appropriate.

I would hold that Farris should be suspended indefinitely from the practice of law with no

leave to reapply for two years. Further, I would order that Farris must make complete

restitution to the two clients harmed by his actions before he may apply for reinstatement.

_____
GEORGE W. DRAPER III, JUDGE