The PEOPLE of the State of Colorado, Complainant

v.

Thomas John BRAHAM, Respondent

Case Number: 17PDJ035

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

DATED OCTOBER 12, 2017.

ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE OFFICE OF THE PRESIDING DISCIPLINARY JUDGE, 1300 BROADWAY, SUITE 250 DENVER, CO 80203

## OPINION AND DECISION IMPOSING SANCTIONS UNDER C.R.C.P. 251.19(c)

WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE

Thomas John Braham ("Respondent") represented a client in a DUI case. But he failed to appear for the plea hearing. He then failed to respond to the court's show cause order and to appear at the contempt hearing. Respondent was also hired to file a bankruptcy case. In that case, he attached his client's electronic signature to the bankruptcy documents without permission and abandoned the client. In two other matters, Respondent abandoned his clients' bankruptcy cases and knowingly converted their funds. He compounded this misconduct by disregarding requests from disciplinary authorities and by failing to fully participate in this disciplinary proceeding. Respondent's conduct warrants disbarment.

## I. PROCEDURAL HISTORY

On May 18, 2017, Jacob M. Vos, Office of Attorney Regulation Counsel ("the People"), filed a complaint with Presiding Disciplinary Judge William R. Lucero ("the Court"). The People mailed a copy of the complaint the next day to Respondent's registered business address. He failed to answer, and the Court granted the People's motion for default on July 25, 2017. Upon the entry of default, the Court deemed all facts set forth in the complaint admitted and all rule violations established by clear and convincing evidence.[1]

On September 28, 2017, the Court held a sanctions hearing under C.R.C.P. 251.15(b). Vos represented the People; Respondent appeared and presented evidence in mitigation. The People's exhibits 1-11 were admitted into evidence,[2] and the Court heard telephone testimony from Linda Finch, TaBe Spell, and Wendy Garcia. Per the Court's directive, the People filed a "Supplemental Sanctions Brief" on October 5, 2017. That same day, Respondent submitted a "Post Hearing Disability Brief."

## II. ESTABLISHED FACTS AND RULE VIOLATIONS

The Court adopts and incorporates by reference the averments in the admitted complaint, presented here in condensed form. Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on June 9, 2009, under attorney registration number 41010. He is thus subject to the Court's jurisdiction in this disciplinary proceeding.[3]

### Plaster Matter

Shane Plaster hired Respondent in 2016 to represent him in a DUI case. Respondent failed to appear for a plea and setting hearing on August 4, 2016. He then failed to appear at the rescheduled hearing on September 1. The same day, the court set a show cause hearing for September 15 to determine why Respondent had failed to appear. Respondent did not attend that hearing. The court ordered Respondent to appear for a contempt hearing on September 19, but he did not. The court continued the contempt hearing to September 23, but again Respondent failed to appear.

In this matter, Respondent violated Colo. RPC 3.4(c), which forbids a lawyer shall not knowingly disobeying an obligation under the rules of a tribunal, and he violated Colo. RPC 8.4(d), which proscribes conduct prejudicial to the administration of justice.

---

**1.** See C.R.C.P. 251.15(b); *People v. Richards*, 748 P.2d 341, 346 (Colo. 1987).

**2.** Respondent stipulated to the admission of exhibits 1-11.

**3.** See C.R.C.P. 251.1(b).

## Finch Matter

Linda Finch ("Finch") divorced Mark Tozer in 2008. The couple had two children. Sometime thereafter, she married Travis Finch. In 2014, Finch hired Respondent to help her file a Chapter 13 bankruptcy petition. On January 24, 2014, Respondent filed the petition on Finch's behalf. This filing contained numerous errors, including describing Finch as unmarried and listing only her income and debts, even though she was married. Respondent also failed to list Tozer's child support payments as a source of Finch's income. Finch did not review, approve, or sign the bankruptcy petition that Respondent filed, yet he placed her electronic signature on the document.

Also on January 24, 2014, Respondent filed a proposed bankruptcy plan, requesting that Finch be ordered to pay $490.00 per month for sixty months. Finch did not approve this plan before Respondent filed it. Nor did she sign the plan, even though it bore her electronic signature. On February 27, 2014, the Chapter 13 trustee objected to the plan on several grounds. Respondent filed an amended plan, which included his handwritten revisions on the form. The new plan provided for a $520.00 monthly payment. Once again, Respondent included Finch's electronic signature although Finch had not reviewed or approved the plan.

On July 8, 2014, Finch's Chapter 13 plan was approved. Respondent submitted a request for attorney's fees on October 23, 2014, seeking $3,600.00 in fees to be paid through Finch's plan.

Finch made no payments under the plan, however, and on October 28, 2014, the trustee moved to dismiss her bankruptcy case for failure to make payments. The court dismissed her bankruptcy case on December 5, 2014. Respondent advised Finch not to contest the motion to dismiss so that they could refile an alternate plan.

On May 9, 2015, Finch received a letter from her former divorce counsel, Greg Quimby, indicating that he had served a writ of garnishment on Finch's employer to collect attorney's fees. Twenty-five percent of Finch's wages were garnished. Finch asked Respondent to file another Chapter 13 bankruptcy petition.

Respondent filed a second petition and schedule but the documents contained multiple errors. On May 29, 2015, Respondent filed a Chapter 13 plan, proposing that Finch pay $175.00 a month. This plan did not provide for any payments to Finch's mortgage holder. Once again, Finch did not review, approve, or sign this petition before Respondent filed it, yet it bore her electronic signature.

On July 6, 2015, the trustee objected to Finch's plan, citing multiple errors and omissions. Finch had previously given Respondent the information that the trustee sought. Respondent filed an amended plan on August 12, 2015, which bore Finch's electronic signature. Finch had not reviewed, approved, or signed the plan.

Finch emailed Respondent on August 20, 2015, stating that her husband's debt was not listed on the amended plan and asking Respondent to revise the plan. Lori Orth, Respondent's paralegal, set up a meeting with Finch, but the meeting never occurred.

On September 16, 2015, the court held a hearing to determine why Respondent had not filed another amended plan. Respondent appeared at the hearing and was ordered to file an amended plan by September 23, 2015. Respondent timely filed a second amended plan electronically signed by Finch. He once more filed that plan without Finch's approval. The trustee again objected to the plan, citing inconsistencies with the payment plan. Respondent filed a third amended plan on November 4, 2015, correcting the payment plan. Respondent did not seek Finch's approval or signature before submitting this plan. The trustee withdrew his objection on November 30, 2015.

Just after Thanksgiving 2015, Finch's husband lost his job, affecting Finch's ability to make payments under her bankruptcy plan. Finch called Respondent, and he told her that she should wait until February 2016 to revise her plan. On February 4, 2016, the court approved Respondent's prior $3,600.00 fee request, of which Respondent was paid $3,036.00.

By March 2016, Finch was having difficulty making payments under her bankruptcy plan. She unsuccessfully tried to communicate with Respondent about revising the plan.

The trustee again moved to dismiss Finch's bankruptcy on May 5, 2016, because she had made no payments since February 2016. Respondent was served with this motion. Finch and Respondent exchanged a series of text messages in May 2016 in which Finch asked Respondent to revise her plan. Finch also sent Respondent additional documentation about her financial situation. Respondent's paralegal Tracy Friel drafted additional bankruptcy documents for Finch and sent them to Respondent for review.

On May 24, 2016, Finch texted Respondent, alerting him that she was struggling to make the payments under the plan and asking him to stop the Trustee from dismissing her case. Respondent claimed that did not know the trustee had filed a motion to dismiss. Respondent again advised Finch via text message not to contest the dismissal. He later texted Finch and told her to get current on her payments. Meanwhile, Finch spoke with the trustee, who advised her to have her attorney file a motion to modify the plan. Finch thought Respondent would file a modified plan based on her communications with Respondent.

On June 3, 2016, Respondent moved to modify Finch's plan based on her husband's loss of employment. This motion was filed seven months after Mr. Finch became unemployed. Finch forwarded Respondent additional income information, but Respondent never incorporated that information into any bankruptcy filing. It was around this time that Finch found that she was unable to communicate with Respondent. Respondent had abandoned his office. Finch's former divorce attorney and her homeowner's association filed objections to her motion to modify.

On July 27, 2016, Respondent sent Finch a text message directing her to contact Orth. Between this date and August 2016, Orth tried to communicate with Respondent. Respondent provided Orth with no direction about Finch's case.

The court set a hearing on Finch's motion to modify for August 24, 2016. Respondent was required to appear at this hearing to discuss the status and schedule of the case and to present factual or legal issues related to the motion to modify. Finch asked Respondent if she needed to appear as well. Respondent texted her and said, "[i]t might be telephonic." Respondent never again contacted Finch about the hearing, and he failed to appear at the hearing. Finch was not present either. The court denied the motion to modify and stated that it would consider dismissing the case if the trustee filed a motion to do so.

On September 1 and October 3, 2016, Respondent withdrew attorney's fees from Finch's Chapter 13 plan. On September 7, 2016, Finch contacted Orth to update her about why Respondent had not appeared at the hearing in August. Orth responded, stating that they were making progress with the homeowner association's attorney but had not made progress with Finch's former divorce attorney. Orth also told Finch that she was unable to reach Respondent for an update.

The People tried to contact Respondent on September 28, 2016, but could reach only his voicemail message, which indicated that he would be hospitalized for some time. That message also directed clients to contact certain attorneys to perform their legal work.

On October 31, 2016, the trustee filed a motion to dismiss Finch's bankruptcy because her payments were not current. Orth told Finch on November 5 that she had been unable to contact Respondent, and she advised Finch to seek other counsel. As of November 30, 2016, Respondent received an additional $2,296.00 in fees from Finch's second bankruptcy plan. The court dismissed Finch's bankruptcy on February 27, 2017.

In this case, Respondent transgressed eight Rules of Professional Conduct: Colo. RPC 1.1, which requires a lawyer to competently represent a client; Colo. RPC 1.3, which requires a lawyer to act with reasonable diligence and promptness when representing a client; Colo. RPC 1.4(a)(4), which requires a lawyer to promptly comply with requests for information; Colo. RPC 1.5(a),

which states that a lawyer may not charge or collect an unreasonable fee; Colo. RPC 1.16(d), which states that a lawyer shall protect a client's interests upon termination of the representation; Colo. RPC 3.3(a)(1), which forbids a lawyer from knowingly making a false statement of material fact or law to a tribunal; Colo. RPC 8.4(c), which interdicts conduct involving dishonesty, fraud, deceit, or misrepresentation; and Colo. RPC 8.4(d).

### Garcia Matter

Wendy Garcia hired Respondent in April 2016 to handle her Chapter 7 bankruptcy case. She paid him $1,435.00 for attorney's fees and filing costs. By mid-July 2016, Garcia had provided Respondent with all the documents he had requested in order to file her bankruptcy petition. Respondent told her he would file her case in early August 2016.

Garcia repeatedly tried to contact Respondent but was unsuccessful. He neither filed her bankruptcy petition nor refunded her fees. On October 3, 2016, Garcia terminated Respondent's representation and requested that he return her file. He did not do so.

In this case, Respondent transgressed Colo. RPC 1.3, 1.4(a)(4), 1.16(d), and 8.4(c).

### Spell Matter

In July 2016, TaBe Spell hired Respondent to file a Chapter 7 bankruptcy petition. She paid him a flat fee of $1,535.00 and completed his bankruptcy worksheet. After August 2016, Respondent stopped responding to Spell's efforts to communicate with him. On October 12, 2016, Spell requested the return of her file and attorney's fees, but Respondent never responded.

Through his conduct in the Spell matter, Respondent violated Colo. RPC 1.3, 1.4(a)(4), 1.16(d), and 8.4(c).

### The People's Investigations

In the investigations of all four matters described above, the People tried to communicate with Respondent via email, telephone, and mail. Respondent failed to respond to any of these attempts. Accordingly, he violated Colo. RPC 8.1(b), which provides that a lawyer shall not knowingly fail to respond to a lawful demand for information from a disciplinary authority.

### Respondent's Testimony

Respondent testified that he has a history of alcoholism. He said that until February 2016 he had been sober for six and a half years. That month, he explained, he underwent stomach surgery and was prescribed Vicodin for his pain. He said he also began drinking heavily and was taking an "extreme load" of Lexapro for his anxiety. According to Respondent, he was "self-medicating" with alcohol and taking Ambien at night in order to fall asleep. His drinking and prescription medication abuse consumed his law practice, he said, and he could no longer competently practice law. Due to his divorce, he also lost his stable living arrangements that month. Respondent said that he tried to complete his active cases but ultimately "collapsed" and was evicted from his place of business.

Also in February 2016, Respondent was ordered to undergo an independent medical examination ("IME") with Dr. David Stevens in case number 15PDJ095.[4] The People requested the IME to evaluate, in part, whether Respondent was able to competently fulfill his professional responsibilities. From February to March 2016, Respondent met with Dr. Stevens on three occasions.[5] Even though Respondent testified here that he began drinking heavily in February 2016, Respondent's use of alcohol is referenced only in two places in the IME report. First, Dr. Stevens recounted that during the first clinical interview on February 26, 2016, Respondent "spontaneously noted that he had stopped drinking 6½ years ago. He stated 'you have to learn how to handle stress when you stop drinking.'"[6] Next, Dr. Stevens noted that Respondent was upset with Vos during the March 25 clinical interview, stating "[t]o be accused of being [ ] intoxicated when you've

---

4. Ex. 10.

5. *See* Ex. 10 at 2.

6. Ex. 10 at 4.

been sober for 6½ years is so awful ... To accuse me of drinking is such an outrage." [7]

According to Respondent, he did not tell Dr. Stevens that he began drinking after nearly seven years of sobriety because the focus of the IME was limited to his "mental health." Respondent also did not think that Dr. Stevens was "certified" in addiction. Respondent testified that he did not believe he hid his alcoholism from Dr. Stevens, although he also stated that he only "self-identifies" as an alcoholic at Alcoholic Anonymous ("AA") or Narcotics Anonymous ("NA") meetings. Although Respondent admitted that in hindsight his alcohol relapse would have been relevant to Dr. Stevens's evaluation, he insisted that he was not "directing" the interview.

Respondent testified that on September 22, 2016, he voluntarily committed himself to the West Pines rehabilitation center, where he remained until October 10, 2016. Respondent maintained that he felt "shameful" about being admitted to West Pines. After leaving the rehabilitation center, Respondent went to live in California with his sister, a nurse. He felt that his time with his sister was instrumental in maintaining his sobriety. Respondent testified that he has been sober since September 21, 2016, and recently celebrated this milestone at AA and NA. He said he is actively involved in AA and NA both in Denver and Boulder and attends several meetings each week—and that he went to a meeting the morning of the sanctions hearing. Respondent also participates in the Phoenix, a sober active community, and frequency rock climbs and attends yoga classes.

In October 2016, the Court held a prehearing conference in Respondent's disciplinary case number 15PDJ095. Even though disability issues were addressed at this conference, Respondent failed to mention his alcohol relapse. He also attended a disciplinary hearing in November 2016 in case number 15PDJ095, nearly a month after he left the West Pines facility, but made no mention of his alcohol

relapse. Respondent testified that at the time he was "grappling" with his alcoholism and recent sobriety, and he was ashamed to inform the Court of his condition.

Respondent explained that he did not participate in the instant proceeding until the sanctions hearing because he was focused on his sobriety and divorce. Respondent explained that he wanted to offer evidence in mitigation and to explain his failure to participate. He said he likely received but ignored the People's letters during their investigation of this matter. He also stated that he received in July 2017 the People's notice of the sanctions hearing but was assisting a friend on the Western Slope, returning only recently to Boulder to celebrate his one year of sobriety.

Although he has remained sober since September 2016, Respondent has made no efforts to return his clients' files or any unearned funds. Instead, he said that he has been focused on himself, his divorce, and getting better. When asked why he had not reimbursed his clients, Respondent replied only that he "was not participating in this hearing," and he "had no good answer" why he had not made refunds.

### III. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* ("ABA *Standards*") [8] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[9] When imposing a sanction after a finding of lawyer misconduct, the Court must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty*: By abandoning his clients' cases, failing to respond to requests for infor-

---

7. Ex. 10 at 4, 7. Respondent did, however, disclose to Dr. Stevens his overuse of Lexapro and the problems that this caused in his law practice. Ex. 10 at 7-8.

8. Found in ABA *Annotated Standards for Imposing Lawyer Sanctions* (2015).

9. *See In re Roose*, 69 P.3d 43, 46-47 (Colo. 2003).

mation, charging an unreasonable fee, and converting funds, Respondent violated his duties to his clients. Respondent's deceptive inclusion of Finch's electronic signatures on submissions to the court and his refusal to honor the district court's show cause order in the Plaster case represent derelictions of his obligations to the legal system. The ABA *Standards* denominate Respondent's refusal to cooperate in this matter as a violation of his duty to the profession.

*Mental State*: The Court's order entering default establishes that Respondent knowingly violated Colo. RPC 3.3(a)(1), 3.4(c), 8.1(b), and 8.4(c). The evidence strongly suggests that Respondent knowingly committed the other misconduct at issue in this case.

*Injury*: At the sanctions hearing, Respondent's clients testified about how Respondent's conduct harmed them. Finch testified that she had problems making payments under her bankruptcy plan because her husband lost his job, and she wanted Respondent's help to modify the plan. The trustee had moved to dismiss her bankruptcy case, so she continually reached out to Respondent for assistance but was unable to reach him. Respondent kept referring her to his paralegals rather than working on her case. Respondent became difficult to reach during summer 2016, Finch said. She eventually had to wait for her second bankruptcy to be dismissed before she could hire a new attorney. Meanwhile, she said, she was harassed by creditors. She also testified that her wages are still garnished $600.00 a month to pay her former divorce attorney because Respondent did not help to stop or modify the garnishment. According to Finch, Respondent never returned any of her funds, despite taking attorney's fees from her plans, which were riddled with errors.

Garcia stated that even though she paid Respondent an advance fee, he never filed her bankruptcy petition or returned her file. She had to hire another attorney to assist her. This process was very stressful, she said, because she was unable to see "the light at the end of the tunnel" and felt as if "everything was collapsing around" her. According to Garcia, she had to raise additional funds to pay the second attorney and in her dire financial situation, that was not easy. Because her bankruptcy filing was delayed over a year, she was hounded by creditors longer than necessary.

Spell also testified that she paid Respondent an advance fee, yet he never filed her bankruptcy petition. She said that Respondent was impossible to reach. Even though she asked Respondent to return her money and her file, he refused to comply. According to Spell, Respondent told her that she could file for bankruptcy based on her past-due tax debt. She consulted with a different attorney but was unable to hire that attorney because she did not have the funds. As a result, her bankruptcy was never filed. This process led to her accumulation of additional debt and to a great of stress on her marriage. She and her husband are now getting divorced. Spell testified that Respondent's misconduct worsened her relationship with her husband.

In addition to the harm suffered by Respondent's clients, the Court finds that Respondent injured the court system and the legal profession through his misconduct.

### ABA *Standards* 4.0-7.0—Presumptive Sanction

Disbarment is the presumptive sanction in this case under at least two of the ABA *Standards*: ABA *Standard* 4.11 calls for disbarment where a lawyer knowingly converts client property, thereby causing a client injury or potential injury. Likewise, ABA *Standard* 4.41 indicates that disbarment is appropriate when a lawyer abandons the practice and causes serious injury or potentially serious injury to a client. Given the clear applicability of these *Standards*, it is unnecessary for the Court to review the other applicable *Standards*.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may warrant a reduction in the

severity of the sanction.[10] Five aggravating factors are present here, while only three mitigators apply.

*Dishonest or Selfish Motive—9.22(b)*: The Court concludes that Respondent acted selfishly in retaining client funds that he did not earn in full. In the Finch case he twice drew attorney's fees based on Finch's bankruptcy plan, despite filing documents peppered with errors and eventually abandoning her case. Likewise, Respondent acted selfishly when he failed to return Garcia's and Spell's advance fees, despite performing no work on their cases. The Court also concludes that Respondent acted dishonestly by filing Finch's bankruptcy documents with her electronic signature without her review or approval. The Court chooses to weigh this factor heavily in aggravation.

*Pattern of Misconduct—9.22(c)*: Respondent was suspended for one year and one day in case number 15PDJ095, consolidated with case number 16PDJ034. His suspension in those cases took effect on February 27, 2017. The Court notes that Respondent's misconduct in those consolidated cases was similar to that in the Finch matter and occurred during the same time frame. Again in the Finch matter, Respondent exhibited a lack of diligence in handling a bankruptcy case, failed to respond to client communications, knowingly engaged in dishonest conduct, and misrepresented to the bankruptcy court that his clients had reviewed and signed bankruptcy documents when they had not done so. Likewise, in the consolidated cases he failed to return his clients' files upon request. Because the conduct addressed in the instant disciplinary proceeding occurred before Respondent was suspended in the consolidated cases, the Court considers that misconduct as a pattern of misconduct rather than as a prior disciplinary offense.[11]

Further, the Court finds that Respondent also engaged in a pattern of misconduct in this disciplinary matter. He abandoned three clients and converted two clients' funds. The Court is troubled that Respondent has repeatedly breached his ethical duties to numerous clients from 2014 to 2016. The Court thus considers this a significant factor in aggravation.

*Multiple Offenses—9.22(d)*: Respondent committed several types of rule violations here, including disobeying court orders, engaging in conduct prejudicial to the administration of justice, providing incompetent representation, acting without diligence, charging an unreasonable fee, failing to respond to client communications, making false statements to the court, failing to return his clients' files and unearned fees, converting funds, and failing to respond to the People's requests for investigation. The Court gives this aggravating factor great weight.

*Bad Faith Obstruction of the Disciplinary Proceeding—9.22(e)*: Although the Court finds that Respondent's failure to participate in this proceeding is addressed by the Colo. RPC 8.1(b) charge, there is some evidence that Respondent otherwise intentionally acted in bad faith once formal disciplinary charges were filed. Respondent admitted that he received communications from the People during the instant disciplinary proceeding but he chose to ignore those communications. The Court will weigh this factor in aggravation.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g)*: The People ask the Court to apply this factor in aggravation because Respondent failed to participate in the disciplinary proceeding and never acknowledged the wrongful nature of his misconduct. The Court finds, however, that Respondent exhibited some acknowledgment of his wrongdoing. While crossexamining Finch, Garcia, and Spell, Respondent admitted that

10. *See* ABA *Standards* 9.21 & 9.31.

11. *See People v. Williams*, 845 P.2d 1150, 1152 n.3 (Colo. 1993) (choosing to apply in aggravation a pattern of misconduct rather than prior disciplinary offenses where the misconduct in the instant case occurred before the lawyer was suspended in the earlier case); *People v. Honaker*, 863 P.2d 337, 340 (Colo. 1993) (treating the lawyer's first disciplinary case as evidence of a pattern of misconduct rather than prior discipline because the underlying conduct in the two cases occurred contemporaneously and the major part of the misconduct in the second case ended prior to the order of suspension in the earlier case).

he engaged in misconduct and sincerely apologized to them for his conduct. Thus, the Court chooses not to apply this factor in aggravation and chooses instead to give Respondent some credit in mitigation for demonstrating remorse, as discussed below.

*Indifference to Making Restitution—9.22(j):* Respondent never refunded Finch's attorney's fees even though his conduct resulted in the dismissal of her bankruptcy cases. Nor did he refund fees to Garcia or Spell even though he abandoned their cases and converted their funds. When asked at the hearing why he has not refunded clients' fees, he stated that he believed that he had earned a portion of Garcia's and Spell's fees but provided no cogent reason why he failed to return the remainder of those fees of any of Finch's fees during the past year. The Court assigns this aggravator significant weight in its sanction analysis.

*Personal and Emotional Problems—9.32(c):* [12] Respondent has in the past struggled with mental health and medication management issues.[13] In addition, as described in detail above, Respondent testified that he is an alcoholic but was sober for six and a half years, until February 2016. It was during this month, Respondent said, that he started drinking heavily after undergoing stomach surgery and beginning to take prescription painkillers.

Respondent did not produce additional evidence corroborating his alcohol use disorder. Respondent testified that he voluntarily committed himself to West Pines in September 2016 and has been sober since his discharge. Yet he produced no records from West Pines in support of his recovery. Further, his current account is inconsistent with his actions in the consolidated cases. During the period that Respondent said he was drinking again, Respondent did not disclose this fact to Dr. Stevens. Respondent knew that Dr. Stevens was evaluating his fitness as a lawyer, yet he failed to mention his relapse, a fact certainly relevant to such an evaluation. Although Respondent testified that he was ashamed that he was drinking again, he was very forthcoming with Dr. Stevens about his abuse of prescription medications and the problems it caused in his law practice. Moreover, Respondent specifically told Dr. Stevens on two occasions that he had been sober for nearly seven years and demonstrated offense when Vos implied otherwise. These inconsistencies somewhat undercut Respondent's testimony.

Respondent avers that this mitigating factor merits great weight because his alcoholism caused his misconduct in the four client matters underlying this disciplinary case. But the Court does not find clear and convincing evidence of a causal connection between Respondent's misconduct and his alcoholism.[14] Respondent did not present medical evidence supporting his causality argument, and his

---

**12.** Respondent's alcohol use disorder could be considered in mitigation under ABA *Standard* 9.32(i) (mental disability or chemical dependency including alcohol or drug use). Application of that standard requires a four-part analysis of medical evidence, causality, rehabilitation, and risk of reoccurrence. *See In re Egbune*, 971 P.2d 1065, 1073 (Colo. 1999) (noting that for ABA *Standard* 9.32(i) to apply in mitigation, the four-part analysis must be considered). The Court concludes that Respondent did not make a sufficient showing under that standard. Other than his own testimony, Respondent failed to produce medical evidence corroborating his alcohol dependency, evidence that his alcoholism caused his misconduct, evidence of a sustained period of successful rehabilitation, or evidence showing that reoccurrence is unlikely. ABA *Standard* 9.32(c) does not require such an analysis. Accordingly, the Court chooses to consider Respondent's alcohol use disorder as a personal and emotional problem under ABA *Standard* 9.32(c). *See In re Stoller*, 902 So.2d 981, 989 (La. 2005)

(accepting a lawyer's medical condition as a personal or emotional problem because he failed to make a showing under ABA *Standard* 9.32(i)).

**13.** These issues were addressed in detail in case number 15PDJ095, consolidated with case number 16PDJ034. Respondent's misconduct in those cases somewhat overlaps temporally with the misconduct in the four matters addressed in this case. And Respondent was also transferred to disability inactive status on October 18, 2016. Respondent did not present evidence here, however, that these issues caused his misconduct now at issue. *See In re Cimino*, 3 P.3d 398, 402 (Colo. 2000) ("The presence of personal or emotional problems is not a significant factor in this case. It did not cause or even affect the onset of the misconduct ... There was no evidence that [the respondent's] personal problems had anything to do with his [misconduct].").

**14.** *Id.* at 402.

testimony about how his alcoholism affected his law practice is unclear at best.[15] Moreover, although Respondent committed the majority of his misconduct in the Plaster, Garcia, and Spell matters during spring and summer 2016—the period in which he testified ·he was drinking again. Respondent's misconduct in the Finch case occurred between 2014 and 2016. Thus his alcoholism did not cause the majority of his misconduct in that case. Moreover, Respondent has never returned Spell's or Garcia's files nor refunded their attorney's fees despite being asked to do so in October 2016, after he stated he was sober.[16] Respondent has made no additional efforts to return files or fees to these clients during his period of sobriety. Accordingly, the Court determines that this mitigating factor is entitled to only little weight.[17]

*Character and Reputation—9.32(g)*: Respondent testified that he has been a great attorney, including starting out his career in the Colorado Supreme Court law library and later clerking for a judge. He also said that he started a clinic in Grand Junction· where he assisted pro se individuals to file for bankruptcy and worked with the Denver Bar Association to develop a bankruptcy packet for pro se litigants. He also has taught classes about small claims court, collections, and bankruptcy for several years. According to Respondent, his pro bono service to the legal community was featured in several prominent legal publications. This factor

merits relatively little consideration in the Court's analysis.

*Remorse—9.32(l)*: Respondent apologized at the sanctions hearing to his clients for his conduct—an apology they graciously accepted. Respondent testified that he feels "horrible" for his conduct in these cases. The Court finds Respondent's apologies sincere and gives him credit in mitigation for his remorse.

### Analysis Under ABA *Standards* and Colorado Case Law

The Court is aware of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[18] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[19] Though prior cases are helpful by way of analogy, the Court is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The People request disbarment in this matter. This request is supported by the ABA *Standards* and Colorado case law. The Colorado Supreme Court has determined that knowing conversion of funds from clients or other parties warrants disbarment, and it is all the more clear that disbarment is warranted when knowing conversion is coupled with abandonment, except where substantial mitigating factors exist.[20] Respondent con-

15. *See In re Hicks*, 166 Wash.2d 774, 214 P.3d 897, 904 (2009) ("We first address the personal or emotional problems mitigator. This court 'require[s] a connection between the asserted problem and the misconduct.' ").

16. *See* Ex. 1; Compl. ¶¶ 134, 148.

17. *See In re Thompson*, 911 A.2d 373, 376 (Del. 2006) (choosing to apply "some weight" to personal and emotional problems in mitigation where the lawyer failed to satisfy the third and fourth prong of the test under ABA *Standard* 9.32(i)); *In re Stoller*, 902 So.2d at 989 ("[I]t would be an exercise in absurdity if we were to hold that a medical condition which does not satisfy the requirements to be considered in mitigation as a mental disability [under ABA *Standard* 9.32(i)] could be entitled to the same weight if simply re-labeled as a personal and emotional problem ... we determine that it carries very little weight.").

18. *See In re Attorney F.*, 285 P.3d 322, 327 (Colo. 2012); *In re Fischer*, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

19. *In re Attorney F.*, 285 P.3d at 327 (quoting *In re Rosen*, 198 P.3d 116, 121 (Colo. 2008)).

20. *See, e.g., People v. Townshend*, 933 P.2d 1327, 1329 (Colo. 1997) (disbarring a lawyer who accepted retainers from two clients, abandoned them, and then failed to participate in the disciplinary proceeding); *People v. Lavenhar*, 934 P.2d 1355, 1358-59 (Colo. 1997) (imposing disbarment for multiple instances of misconduct, the most serious of which was knowing conversion of third-party funds, and stating that "[w]e have repeatedly held that a lawyer's knowing misappropriation of funds, whether belonging to a

tends that substantial mitigating factors are present here and thus a three-year suspension is appropriate. He also argues that because he suffers from alcoholism, he is qualified as an individual with a disability, as defined under the American with Disabilities Act ("ADA"). The Court does not agree with Respondent's arguments. The Court has determined that Respondent's alcohol use disorder did not cause the misconduct at issue here, and because this case involves dishonesty, conversion, and abandonment, the ADA does not prevent this Court from disciplining Respondent.[21] Also, Respondent's personal and emotional problems, good character, and remorse do not justify a reduction in the presumptive sanction when weighed against the multiple aggravating factors and the severity of his misconduct, which included abandonment and knowing conversion of clients' funds.[22] Accordingly, the settled case law, together with the presumptive sanction and the significant applicable aggravating factors, clearly supports disbarment here.

## IV. CONCLUSION

Respondent ignored his duties to multiple clients, the legal system, and the legal profession. Dishonesty to the court and theft of clients' funds are some of the most serious ethical violations a lawyer can commit. Respondent also abandoned multiple cases, failed to return clients' property, and disregarded requests for information from disciplinary authorities. Any sanction less than disbarment would not provide the necessary protection to the public. Accordingly, the Court disbars Respondent.

## V. ORDER

The Court therefore **ORDERS:**

1. **THOMAS JOHN BRAHAM,** attorney registration number 41010, will be **DISBARRED FROM THE PRACTICE OF LAW.** The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment." [23]

2. To the extent applicable, Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent also **SHALL** file with the Court, within fourteen days of issuance of the "Order and Notice of Disbarment," an affidavit complying with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the Court

client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation"); *People v. Varallo*, 913 P.2d 1, 10-12 (Colo. 1996) (indicating that knowing conversion calls for disbarment, absent significant mitigation); *People v. Lefly*, 902 P.2d 361, 364 (Colo. 1995) ("[I]n the absence of significant factors in mitigation disbarment is virtually automatic when a lawyer knowingly converts client funds").

21. *See People v. Reynolds*, 933 P.2d 1295, 1305 (Colo. 1997) (holding that the ADA did not prevent the Colorado Supreme Court from disciplining the respondent for chronic neglect of client matters, misrepresentations to clients, dishonesty, misuse of client funds, and assisting a nonlawyer in the unauthorized practice of law); *Fla. Bar v. Clement*, 662 So.2d 690, 699-700 (Fla. 1995) (holding that the ADA did not prevent the court from sanctioning the respondent because his misconduct, consisting of misappropriation of client funds, "was not a direct result of his bipolar disorder" and thus sanctions do not violate the ADA; and determining that the respondent was not "qualified" to be a member of the bar because he committed serious misconduct and thus "no reasonable modifications" were possible under the ADA); *State ex rel. Okla. Bar Ass'n*

*v. Busch*, 919 P.2d 1114, 1119 (Okla. 1996) (holding that the ADA applies to lawyer disciplinary cases but finding no "reasonable accommodation" could be made with regard to the lawyer's neglect of client matters and deceit in the court "which would accomplish the purpose of maintaining the integrity of the Bar.").

22. *See In re Carey*, 809 A.2d 563, 564-65 (Del. 2002) (finding disbarment warranted for intentional misappropriation of client funds despite compelling evidence of personal and emotional problems); *Conner's Case*, 158 N.H. 299, 965 A.2d 1130, 1135 (2009) (finding that the lawyer's deliberate deception of his clients over a substantial period warranted disbarment despite the presence of a series of personal problems at the time of the misconduct).

23. In general, an order and notice of disbarment will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

setting forth pending matters and attesting, inter alia, to notification of clients and other jurisdictions where the attorney is licensed.

4. The parties **MUST** file any posthearing motions **on or before Thursday, October 26, 2017.** Any response thereto **MUST** be filed within seven days.

5. The parties **MUST** file any application for stay pending appeal **on or before Thursday, November 2, 2017.** Any response thereto **MUST** be filed within seven days.

6. Respondent **SHALL** pay the costs of this proceeding. The People **SHALL** file a statement of costs **on or before Thursday, October 26, 2017.** Any response thereto **MUST** be filed within seven days.