

# SUPREME COURT OF MISSOURI
## en banc

*Opinion issued January 12, 2021*

| | | |
|---|---|---|
| IN RE: ERIC F. KAYIRA, | ) | |
| | ) | No. SC98531 |
| Respondent. | ) | |

## ORIGINAL DISCIPLINARY PROCEEDING

The parties agree that, over a period of approximately five years, Eric F. Kayira repeatedly failed to notify clients he had received funds belonging to them, engaged in a pattern of depleting his clients' funds—frequently to make payments owed to other clients—and misappropriated client funds to pay for personal and firm expenses. As Mr. Kayira acknowledges, disbarment is the baseline sanction for knowingly converting client funds and is the sanction recommended by the disciplinary hearing panel ("DHP") and the office of chief disciplinary counsel ("OCDC").

But, Mr. Kayira argues, this case presents the kind of unusual circumstance in which consideration of mitigating factors should result in imposition of the lesser sanction of indefinite suspension. He notes that, at the time of his conduct, he had serious personal problems, including—he claims without providing any medical support—alcohol abuse and depression. He also was recently divorced. The DHP considered this information but

found it did not sufficiently mitigate Mr. Kayira's wrongful conduct so as to lessen the appropriate sanction from disbarment to suspension.

Mr. Kayira asserts the DHP was unaware he also suffered from bipolar disorder because he did not discover it himself until after his disciplinary hearing and Rule 5.285 did not permit him to raise this mental disorder as a basis for mitigation of the sanction once he had filed his answer. If he had been permitted to raise it, he argues, it would have resulted in a lesser sanction, citing *In re Belz, 258 S.W.3d 38 (Mo. banc 2008)*.

Mr. Kayira is incorrect. Unlike in *Belz,* Mr. Kayira offered no medical evidence to support his claim of a mental disorder, and an unsupported allegation of such a disorder is inadequate to invoke the mitigation features of Rule 5.285. And contrary to Mr. Kayira's assertion that one cannot offer such evidence after the answer is filed, Rule 5.285(b) expressly permits an attorney to raise the issue of a mental disorder out of time if good cause is shown. Not only did Mr. Kayira fail to provide any proof of good cause, he failed to even seek permission to raise this defense or offer any evidence in support of it. Finally, unlike in *Belz*, he did not show additional mitigating factors such as self-reporting and voluntary restitution before the information was filed.

In light of Mr. Kayira's pattern of mishandling and misappropriating client funds, and the lack of sufficient mitigation evidence, this Court disbars him.

## I.     *STANDARD OF REVIEW*

"This Court has inherent authority to regulate the practice of law and administer attorney discipline." *In re Gardner, 565 S.W.3d 670, 675 (Mo. banc 2019)*. "The DHP's findings of fact and conclusions of law are advisory. This Court decides the facts *de*

2

*novo*, independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law." *In re Farris, 472 S.W.3d 549, 557 (Mo. banc 2015)* (citations and quotations omitted). "Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed." *Id.*

## II.   LEGAL STANDARDS GOVERNING ATTORNEY DISCIPLINE

### A.   General Factors Governing Baseline Level of Discipline

> The purpose of discipline is not to punish the attorney, but to protect the public and maintain the integrity of the legal profession. Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct.

*In re Kazanas, 96 S.W.3d 803, 807-08 (Mo. banc 2003).*

This Court determines appropriate discipline by considering its prior cases and the American Bar Association's Standards for Imposing Lawyer Sanctions (1992) ("ABA Standards"). *Gardner, 565 S.W.3d at 677.* After finding a lawyer has committed professional misconduct, this Court considers four primary factors when applying ABA Standard 3.0 in imposing sanctions: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." *Belz, 258 S.W.3d at 42.* These four key factors provide a framework for all disciplinary matters, although other ABA Standards can also "provide guidance as to appropriate sanctions for specific types of misconduct." *Id.*

When this Court finds a lawyer has committed multiple acts of misconduct, it imposes discipline consistent with the most serious violation. *In re Ehler, 319 S.W.3d 442, 451 (Mo. banc 2010).* The most serious misconduct alleged here is the misappropriation

3

of client property. ABA Standard 4.11 provides, "Absent aggravating or mitigating circumstances … [d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." This Court similarly has held "disbarment is most often the appropriate discipline" for the misappropriation of client funds. *Farris, 472 S.W.3d at 570.*

In contrast, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." *ABA Standard 4.12.* This Court similarly has held suspension may be appropriate when an attorney does not intentionally take client property but deals with it in a way that causes injury or potential injury. *See Gardner, 565 S.W.3d at 678* (involving an attorney who was suspended when, in an isolated incident, he paid himself early without permission, but his conduct "d[id] not show an intent on his part to take monies to which he ultimately would not have been entitled").

## B. *Aggravating and Mitigating Factors*

Regardless of the baseline or presumptive discipline, the DHP, and this Court, always consider aggravating and mitigating factors. *Belz, 258 S.W.3d at 42.* The ABA standards list numerous types of mitigating factors, among which are the absence of prior discipline; the absence of a selfish or dishonest motive; personal and emotional problems; timely making restitution or attempting in good faith to do so; full cooperation with the disciplinary authorities; inexperience in the practice of law; good character; physical disability or mental disorder, when supported by appropriate evidence; and remorse. *ABA Standard 9.32.* The ABA standards also list aggravating factors, among which are prior

4

discipline; a dishonest or selfish motive; a pattern of misconduct; multiple violations; bad faith obstruction of the disciplinary proceedings; submitting false evidence; and refusing to acknowledge wrongfulness. *ABA Standard 9.22*. This Court considers these same or similar factors in determining what discipline to impose. *See In re Coleman, 295 S.W.3d 857, 870 (Mo. banc 2009)* (applying aggravating and mitigating factors as set out in the ABA Standards); *In re Stewart, 342 S.W.3d 307, 312 (Mo. banc 2011)* (same).

### III.  THE ATTORNEY MISAPPROPRIATED CLIENT FUNDS, MISUSED HIS TRUST ACCOUNT, AND LACKED CANDOR WITH THE COURT AND OCDC

#### A.  DHP Finding of Misappropriation of Trust Estate Funds

In 2000, Mr. Kayira was admitted to practice law in Missouri. After licensure, he worked as an associate or partner at various St. Louis area law firms before starting his own law firm, Kayira Law, LLC, in 2008. Mr. Kayira was responsible for the maintenance and administration of Kayira Law's trust account and operating account. His practice currently focuses on entertainment and media law, contracts and commercial disputes, and litigation. From 2013 to 2018, however, when the conduct in question occurred, Mr. Kayira also handled personal injury and probate matters.

Mr. Kayira's misconduct came to OCDC's attention as a result of his mishandling of a probate estate in which he and his associate attorney entered their appearances as counsel for the personal representative. As the estate was subject to supervised administration, he was required to seek the probate division's approval for settlements, attorney fee payments, and numerous other matters directly affecting the estate. *See Gardner, 565 S.W.3d at 676 n.5* (explaining the hallmarks of a supervised administration).

He, nonetheless, filed a lawsuit on behalf of the estate without informing the probate division or seeking court approval. He settled the lawsuit for $12,500 but failed to inform the probate division when he received the settlement check. He believed, instead, he had the approval of the estate's beneficiary to take the $12,500 as attorney fees and then paid himself by depositing those fees into his operating account, rather than the estate's account, and dismissed the lawsuit, all without notice to or approval of the probate division.

Mr. Kayira later filed a petition to the convert the estate to an unsupervised estate. In doing so, he told the probate division the estate was still searching for assets and did not disclose that he had filed a suit and settled it for a sum that belonged to the estate but that he had deposited as "earned" attorney fees. Lacking this important information, the probate division granted the petition.

Almost two years later, the probate division discovered the lawsuit and settlement when Mr. Kayira moved to withdraw, and informed Mr. Kayira the settlement check was the estate's asset. The transcript shows it verbally ordered Mr. Kayira to deposit the check into the estate's account. After two months passed without Mr. Kayira complying, the probate division informed OCDC of Mr. Kayira's financial conduct.

When contacted by OCDC, Mr. Kayira falsely told the disciplinary authorities he was "holding" the $12,500 settlement amount in his account. In fact, on the day he made this statement, his trust account contained $9.13 and his operating account contained $3,687.44. While Mr. Kayira claimed at his disciplinary hearing that he had simply meant he believed he had earned the fees, the DHP found this testimony lacked credibility. The DHP similarly found incredible his claim that he thought the estate already had been

6

converted to an unsupervised estate before he received the settlement check, noting his office had sought approval of a $1,510.75 attorney fee payment just a few months earlier, something that is not done in an unsupervised estate and that established Mr. Kayira was aware of the need to seek the probate division's approval.

Mr. Kayira finally complied with the court's order and paid the $12,500 into the estate two days before his scheduled disciplinary hearing—more than five months after the court's order—but, even then, he made misrepresentations to the disciplinary authorities regarding the account from which he paid it.[1] Further, OCDC's later audit revealed the reason the settlement funds had not been in his account when the court first ordered him to pay the settlement into the estate was because he had used a significant portion of the settlement to pay rent he owed on his residence so as to avoid eviction in a pending rent-and-possession action filed by his landlord.

Following the disciplinary hearing, the DHP found Mr. Kayira had violated numerous ethics rules in handling this probate matter, including:

- Rule 4-1.1 (competent representation) by failing to provide competent representation in the probate matter discussed above;

- Rule 4-3.3(a)(1) (false statement to a tribunal) by knowingly and intentionally failing to disclose to the probate division in his petition to convert the estate that he had settled the estate's claim and had already received a settlement check;

---

[1] Mr. Kayira claimed he transferred funds from his operating account to his trust account before remitting the reimbursement check to the estate when, in fact, he had not done so.

- Rule 4-3.4(c) (knowing disobedience of an obligation under the tribunal's rules) by failing to pay the estate back the $12,500 settlement as ordered by the probate division;

- Rule 4-5.1(a) (partner's obligation to ensure all lawyers in a firm conform to the rules) by failing to ensure his associate attorney had the requisite knowledge and skill necessary to provide competent representation in the probate matter discussed above; and

- Rule 4-8.1(a) (false statement in a disciplinary matter) and Rule 4-8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) by falsely representing in response to OCDC's complaint that he was "holding" the $12,500 in settlement funds and that the estate had been converted to an unsupervised estate prior to his receipt of the settlement check and by telling the Advisory Committee he had transferred the $12,500 settlement funds from his operating account to his trust account prior to remitting the reimbursement check to the estate.

## B. *DHP Finding of Misuse of Trust Account and Misappropriation of Client Funds*

The DHP determined mishandling of a probate estate was only a small part of Mr. Kayira's ethics violations. The DHP also found he repeatedly mishandled and misappropriated the funds of 28 clients by engaging in a roughly five-year pattern of depleting one client's funds to pay other clients. Mr. Kayira expressly admits he used some of these clients' funds to pay personal and firm expenses. Further, he admits he repeatedly

failed to provide clients with prompt notice of the receipt of settlement funds and failed to deliver client funds promptly, frequently delaying payment by many months. He also failed to keep accurate—or, in many instances, *any*—records of client receipts and disbursements and of transfers between his trust and operating accounts.

In one of the most egregious instances, in March 2013, Mr. Kayira received a $50,000 settlement via wire transfer on behalf of a client. Mr. Kayira failed to notify this client of the settlement. By July 2013, the $50,000 had been depleted—Mr. Kayira's trust account balance was $440 and his operating account balance was $3,789.04. In November 2014—more than 18 months after Mr. Kayira received the settlement funds—the client inquired about the status of his claim. Only then did Mr. Kayira remit a cashier's check to the client in the amount of $44,493.56 (the amount he owed the client). Mr. Kayira admitted he used some of the client's funds for personal expenses. He also admitted, because he had depleted the client's funds, he had to use another client's funds, along with other funds, to finally pay the client the amount owed.

Not learning from his mistakes, three years later Mr. Kayira negotiated a $385,104.30 settlement on behalf of another client, of which, after other payments were made, Mr. Kayira was entitled to $77,020.86 in fees and the client was owed the remaining $263,595.89. Despite depositing the settlement check in November 2016, he used much of it to pay personal expenses and other clients, so it took him until January 2018—more than 18 months—to pay the client the majority of the funds owed. At the time OCDC filed its information, Mr. Kayira still owed the client $29,741.13.

These were not isolated instances. Mr. Kayira engaged in similar misconduct as to 26 other identified clients, ranging from failing to inform one client of a $7,000 settlement check for more than 10 weeks while he moved the money from his trust account (which was left with $5) into his operating account and used it for his own purposes, to depositing advanced fees straight into his operating account without any evidence the fees had been earned. In another case, Mr. Kayira withdrew $7,500 from the trust account via cashier's checks and deposited those checks into his operating account, using half the amount as a down payment on a personal vehicle.

In other instances, it is impossible to determine how Mr. Kayira used the settlement funds except to say he did not pay those funds to the appropriate clients for many months and, in the interim, the accounts were often almost entirely depleted or even overdrawn. No records exist to explain what happened to other funds other than to show Mr. Kayira often used funds deposited in favor of one client to pay another client who had been owed funds for a longer period.

The DHP found this misconduct violated numerous ethical rules, including:

- Rule 4-1.15(a) (failure to safekeep property) by depositing advance costs, advanced fees, and client funds into his operating account when such funds should have been deposited into his trust account and held intact for the benefit of the client;

- Rule 4-1.15(a)(5) (unauthorized cash or electronic trust account withdrawals) by making in excess of 70 electronic transfers from his trust account to his operating account when this rule requires withdrawals from a

trust account "shall be made only by check payable to a named payee, and not to cash, or by authorized electronic transfer";

- Rule 4-1.15(a)(7) (failure to reconcile trust account) by failing to reconcile his trust account at any point between July 2013 and March 2018 when this rule requires Mr. Kayira to reconcile his trust account "reasonably promptly each time an official statement from the financial institution is provided or available";

- Rule 4-1.15(b) (depositing the lawyer's own funds in the trust account in excess of financial service charges) by depositing funds into his trust account in an amount greater than necessary to pay financial institute service charges;

- Rule 4-1.15(d) (failure to promptly notify client of receipt of funds; failure to promptly deliver client funds) by failing to promptly notify the client he had received settlement funds or other funds in which the client had an interest, failing to promptly deliver funds owed to clients, and failing to pay clients the full amount owed to them;

- Rule 4-1.15(f) (failure to keep complete trust account records) by failing to keep adequate records, including failing to keep a receipt and disbursement journal, individual client ledgers, settlement sheets, accurate bills for legal fees and expenses rendered to clients, fee agreements or retainer agreements with clients, and adequate records involving electronic transfers; and

11

- Rule 4-8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) by knowingly converting client property by repeatedly delaying payment to clients or third parties and depleting their share of funds prior to remitting the payment owed.

### C. The DHP Recommended Disbarment

Based on these findings, the DHP concluded, "The overwhelming evidence presented during the disciplinary hearing revealed that Respondent misappropriated several thousands of dollars belonging to his clients between July 1, 2013, and March 30, 2018, which Respondent admitted to using some of the misappropriated funds for his personal use and benefit." The DHP noted that, absent mitigating circumstances, disbarment would be the appropriate sanction for what it found to be knowing conversion of client funds that resulted in injury.

The DHP considered mitigating evidence, including Mr. Kayira's personal and emotional problems, his remorse, and his general cooperativeness with the disciplinary authorities. It found these mitigating factors were insufficient to mitigate the appropriate sanction of disbarment. It also considered aggravating factors, including Mr. Kayira's previous tax suspension and that he had engaged in a pattern of misconduct, violated multiple rules, had been practicing law for 13 years, and displayed a selfish and dishonest motive. The DHP recommended disbarment.

## IV. DISBARMENT IS THE APPROPRIATE SANCTION

This Court agrees the record supports each of the violations the DHP found, including Mr. Kayira's particularly egregious violations involving misappropriation of

12

client funds for payment of personal and law practice bills. The misappropriation of client funds is "one of the most serious types of attorney misconduct." *Farris, 472 S.W.3d at 570*. Both ABA Standard 4.11 and this Court's cases are in accord that misappropriation usually merits disbarment:

> It is always a ground for the disbarment of an attorney that he has misappropriated the funds of his client, either by failing to pay over money collected by him for his client or by appropriating to his own use funds entrusted to his care. That respondent has made restitution of the converted funds is no defense to these charges.

*In re Mentrup, 665 S.W.2d 324, 325 (Mo. banc 1984)* (citations omitted); *accord In re Phillips, 767 S.W.2d 16, 18 (Mo. banc 1989)* (involving an attorney engaged "in illegal and dishonest conduct when he received funds on behalf of [the client] and converted these funds to his own use by placing them in his office account without the [client's] consent"); *Ehler, 319 S.W.3d at 451* (finding misappropriation is one of the most egregious violations of the ethics rules).

Here, the egregious nature of Mr. Kayira's misconduct is compounded by the aggravating fact that his misappropriation was not an isolated incident but rather is part of a long pattern of behavior. *ABA Standards 9.22* (listing a pattern of misconduct as an aggravating circumstance); *Ehler, 319 S.W.3d at 452* (finding the conduct aggravated by a pattern of misconduct). Indeed, Mr. Kayira freely admits he misappropriated client funds when he used them to pay his residential landlord and to make a down payment on a car. He also admits he used client funds for other personal and firm expenses, routinely depleted client funds to pay other clients, and treated some client payments as "advance fees" before he had earned the funds. This, too, is misappropriation:

> When an attorney deposits the client's funds into an account used by the attorney for his own purposes, any disbursement from the account for purposes other than those of the client's interests has all the characteristics of misappropriation, particularly when the disbursement reduces the balance of the account to an amount less than the amount of the funds being held by the attorney for the client.

*In re Schaeffer, 824 S.W.2d 1, 5 (Mo. banc 1992)*; *see also Farris, 472 S.W.3d at 565* (finding dishonest motive when an attorney was "siphoning trust account funds into his office account and paying personal, non-office related bills and expenses").

The series of events in this case belies any claim by Mr. Kayira that his actions were undertaken without knowledge of their wrongfulness. "Knowledge," as defined in the ABA Standards, is "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." This Court finds, as the DHP did, that Mr. Kayira knowingly converted client funds when he used funds he knew to be client funds to pay for personal and firm expenses and to make payments to clients other than the client for whose benefit the funds were supposed to be held.

In a particularly severe misappropriation case such as this, absent the most compelling of mitigating circumstances, this Court finds disbarment is appropriate.

Mr. Kayira notes he demonstrated charitable and community involvement. He also expressed remorse; thereafter, he fully cooperated with the disciplinary authorities and took classes about how to properly run a law practice.[2] Most importantly, Mr. Kayira claims he

---

[2] While Mr. Kayira also notes he provided restitution, he did not do so until after he had been caught and an information filed. This Court does not find this to weigh heavily in favor of mitigation.

has shown exceptional mitigating circumstances in the form of his testimony as to his personal and emotional issues during the time period relevant to this disciplinary action. In particular, he alleged he was going through a divorce, struggled with alcohol abuse and depression, and, at one point, even considered suicide.

The DHP had before it these mitigating factors, including his cooperation, remorse, and community involvement, as well as his problems with alcohol, depression, and divorce, and this Court considers them as well. ABA Standard 9.32(c) provides that such personal or emotional problems can appropriately be considered in mitigation. As many states note, such evidence is particularly relevant to the attorney's state of mind and intent. *See, e.g., People v. Braham*, *409 P.3d 655, 664 n.12 (Colo. O.P.D.J. 2017)* (considering attorney's depression as an emotional or personal problem where attorney did not show it met standard of medical disability); *In re Thompson, 911 A.2d 373, 377 (Del. 2006)* (same); *Johnson v. Kentucky Bar Ass'n, 364 S.W.3d 192, 194 (Ky. 2012)* (noting mitigating factors included "dealing with several family matters including his wife undergoing bypass heart surgery and his father's death"); *In re Disciplinary Action against Kirschner, 793 N.W.2d 196, 200 (N.D. 2011)* ("[P]ersonal or emotional problems do not justify or excuse a lawyer's misconduct, but are mitigating factors that may reduce a disciplinary sanction against a lawyer."). In addition to personal and emotional problems, ABA Standard 9.22 provides for consideration of cooperation, character, and remorse.

Such mitigating evidence, however, must be weighed against the seriousness of the offenses and the evidence in aggravation. Here, that included evidence not only of the misappropriation discussed above but dishonesty when Mr. Kayira initially lied to OCDC

in stating that he was "holding" the $12,500 in funds and that he believed the estate was not supervised at the time he paid himself the $12,500. Mr. Kayira also engaged in a long pattern of misconduct and displayed a selfish and dishonest motive when he used client funds to pay his rent, car payment, and other miscellaneous personal and firm expenses. He also displayed a selfish and dishonest motive by continuing to engage in a repeated cycle of paying one client with another client's money. As this Court stated in *In re Williams*:

> We cannot allow an attorney to escape ultimate responsibility for mishandling of a client's funds where he knowingly and intentionally ignores trust account problems and demonstrates an almost total disregard for the protection of those funds. Certainly where an attorney misappropriates a client's funds, protection of the public is uppermost in our minds and disbarment is generally appropriate in such cases.

*711 S.W.2d 518, 522 (Mo. banc 1986)*. This Court agrees the evidence presented at the hearing before the DHP does not provide a basis for reducing the baseline sanction from disbarment to an indefinite suspension.

This does not end the matter, however. In his brief before this Court, Mr. Kayira for the first time claimed he has learned he also suffers from bipolar disorder and believes he was suffering from it at the time of his misconduct. Mr. Kayira asserts the DHP was unaware he had this mental disorder when it recommended disbarment because he did not discover it himself until after his disciplinary hearing and Rule 5.285 did not permit him to raise this mental disorder as a basis for mitigation of the sanction once he had filed his answer. He would have raised this mitigator had he been permitted to do so, he argues, and then the DHP may have recommended a lesser sanction. In support, he cites *Belz, 258*

16

*S.W.3d 38*, in which an attorney with a mental disorder was suspended rather than disbarred following evidence his conduct was caused in part by a mental disorder.

Mr. Kayira's argument and reliance on *Belz* are incorrect for numerous reasons. First, in *Belz*, the attorney self-reported and kept meticulous records showing what had happened to his clients' funds, *id. at 39*, whereas Mr. Kayira failed in both these respects. Second, Mr. Kayira offered no medical evidence to support his claim of a mental disorder. By contrast, in *Belz,* medical experts testified about the attorney's mental disorder. *Id. at 44*.

And, while Mr. Kayira is correct that, after *Belz* was decided, this Court adopted Rule 5.285, he is wrong that it does not permit an attorney to raise the existence of a mental disorder after the attorney has filed an answer, which he had filed long before he received his alleged diagnosis.[3]  To the contrary, while Rule 5.285 indeed provides that notice of the particular mental disorder and how it affected the attorney's misconduct must be provided no later than the answer or amended answer, it then states, "*For good cause shown, the time for claiming the mitigating factor may be extended*."  Rule 5.285(b) (emphasis added).

Mr. Kayira made no attempt to show the DHP he had good cause for failing to raise his mental condition in his answer.[4]  He did not even move to supplement the record with

---

[3] Mr. Kayira did give notice in his answer of an intent to claim attention deficit disorder or attention deficit hyperactivity disorder as a mental disorder, but he has since abandoned that mitigation claim and never presented evidence from a licensed medical health professional regarding those conditions.

[4] "Good cause should be given a liberal interpretation and includes good faith mistakes and even negligence[.]"  *Dozier v. Dozier, 222 S.W.3d 308, 313 (Mo. App. 2007)* (analyzing

evidence of his claimed diagnosis, much less support such a motion with medical evidence, even though he did successfully move to submit other evidence regarding restitution after the close of the disciplinary hearing. Further, he does not even allege he could have offered evidence that this disorder is what caused his repeated misappropriation and other inappropriate behavior over the roughly five-year period in question, or otherwise met the requirements of Rule 5.285. It was his burden to so demonstrate. *Id.* ("Respondent shall bear the burden of proof that the mental disorder is a mitigating factor.").

## V.    *CONCLUSION*

For years, Mr. Kayira engaged in an egregious pattern of mishandling and misappropriating client funds. Despite being on notice in 2014 that his trust account practices were resulting in the conversion of client funds, he failed to correct course. Rather than address the obvious issues related to his management of client funds, he continued to engage in a pattern of depleting one client's funds to make payments owed to other clients. Because of this revolving door, Mr. Kayira routinely failed to pay his clients promptly the funds to which they were entitled. Payments were frequently delayed by months and, in the worst cases, by 18 months or more. Equally troubling is Mr. Kayira's declaration that he never had a selfish motive despite his use of client funds to pay for his rent, a personal vehicle, and various other personal and firm expenses.

---

good cause for setting aside default judgment under Rule 74.05(d)); *Brungard v. Risky's Inc., 240 S.W.3d 685, 688 (Mo. banc 2007)* ("'Good cause' is defined under Rule 74.05(d) as including 'a mistake or conduct that is not intentionally or recklessly designed to impede the judicial process.'"). Rulings regarding good cause are reviewed for abuse of discretion. *Risky's Inc., 240 S.W.3d at 688.*

In light of Mr. Kayira's serious and repeated misappropriation of client funds, disbarment is the appropriate sanction in this case. Although this Court has considered Mr. Kayira's emotional and personal problems and other mitigating factors, they do not change the appropriate discipline in this case. His remorse and after-the-fact desire to learn proper trust accounting practices likewise provide him no salvation. This Court has long said, "To disbar an attorney, it must be clear that the attorney is not fit to continue in the profession; disbarment is reserved only for clear cases of severe misconduct." *In re Mirabile, 975 S.W.2d 936, 939 (Mo. banc 1998)*. This is such a case.

Mr. Kayira is ordered disbarred.

_____
**LAURA DENVIR STITH, JUDGE**

Wilson, Russell, Powell, Breckenridge, and Fischer, JJ., concur.
Draper, C.J., not participating.